**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>              Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>              Defendants. | CASE NO.: 4:23-CV-206 |

## COMPLAINT

Plaintiff CAREER COLLEGES & SCHOOLS OF TEXAS ("CCST") for its complaint against Defendants the U.S. DEPARTMENT OF EDUCATION (the "Department") and the Honorable MIGUEL CARDONA, in his official capacity as the Secretary of the Department of Education (the "Secretary"), alleges, by and through its undersigned attorneys, as follows:

### INTRODUCTION & NATURE OF THE ACTION

1.      Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551–706 ("APA") and the U.S. Constitution, CCST brings this action challenging the Department's November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan ("Perkins"), and the Federal Family Education Loan ("FFEL") programs.  *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

2.      On November 1, 2022, the Department adopted the Final Rule, which, as it stands, will take effect on July 1, 2023.

3.      As set forth in greater detail below, CCST is a trade association for the proprietary sector of higher education.  The majority of CCST's more than 70 member schools participate in the Direct Loan Program.  CCST and its member schools support lawful, rational regulations governing federal aid, which can support students and promote institutional accountability. Although CCST's members are career-oriented, private institutions, the new regulations also apply to all participants in Title IV programs under the Higher Education Act of 1965 ("HEA"), including public and nonprofit schools.

4.      The Final Rule upends critical regulations governing borrower defenses to repayment ("BDR"). For the third time since 2016, the Department has introduced amendments aimed at "streamlining" the resolution of borrower defense claims.  Among other things, the latest iteration creates a borrower defense framework with new federal standards, adjudicatory schemes, and evidentiary presumptions.  The apparent goals of this new framework are to accomplish massive loan forgiveness for borrowers and to reallocate the correspondingly massive financial liability to institutions of higher education.  The Final Rule will cause financial and reputational harm to schools, educational harm to students, and budgetary harm to the public fisc.

5.      The Final Rule represents enormous Executive overreach in violation of the Department's statutory authority and the separation of powers.  In Section 455(h) of the HEA, Congress granted the Department a very specific and limited rulemaking power: to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under" the Direct Loan Program.  20 U.S.C. § 1087e(h). Invoking this limited grant and the agency's general rulemaking powers, the Department has

2

generated a sprawling rule that not only redefines such acts and omissions, but remakes borrower "defenses" into claims with no limitations period. The Department arrogates to itself the power to adjudicate such borrower "claims" in both individual and group proceedings and then shift potentially existential liability to schools and institutions in separate recoupment proceedings that likewise are without statutory basis. In its self-created proceedings, the Department will enforce both federal standards of its own invention as well as breach-of-contract and other state-law claims against schools. That breathtaking assertion of federal administrative power is unauthorized by statute; it also violates the U.S. Constitution by exceeding restrictions on the administrative exercise of judicial power, abrogating state laws and prerogatives, and denying jury trial rights.

6.     Not only are the processes created under the Final Rule unlawful, but they also fail to serve any legitimate purpose of the underlying statute. The new processes do not further the fair and accurate adjudication of borrower defense claims. Instead, they are designed to achieve the non-statutory and impermissible objective of massive student loan forgiveness. Rather than merely facilitate or "streamline" the resolution of borrower claims, the Department designed its Final Rule with a thumb on the scale to maximize the number and amount of loan discharges with little regard for the merits of the claims or the rights of schools.

7.     Among the most remarkable features of the Final Rule is that it creates a new vehicle for forgiving individual student loans via "group process," a form of class action, which has its own substantive evidentiary presumptions. If a borrower brings an individual claim, he or she must submit a sworn declaration establishing that the act or omission caused the injury justifying full discharge of his or her loan obligations (and reimbursement of any amounts paid). But if the claim is asserted on behalf of a group, injury and entitlement to full loan discharge are presumed, and there are no procedures (such as discovery or individual witness examination) that

enable its rebuttal, either in the borrower proceeding or a subsequent recoupment proceeding against a school.  A results-oriented rule that creates more favorable substantive outcomes for borrowers in group versus individual proceedings—and thus encourages the filing of group claims—is not only impermissible under the HEA, it is arbitrary and capricious, and violates fundamental principles of due process.

8.     The Department has made clear that the Final Rule is one part of its arsenal to pursue broad forgiveness of student loans.  The federal courts have blocked the Administration's student loan forgiveness plan, and the legality of the Administration's plan is now pending before the United States Supreme Court. This Court should block the unlawful Final Rule, which represents the Department's latest attempt to bypass Congress in the pursuit of loan forgiveness.

9.     For the reasons set forth herein, the Final Rule must be vacated and set aside, and Defendants should be enjoined from implementing or enforcing the Final Rule in any manner.

## PARTIES

10.     CCST is a 501(c)(6) board of trade for the proprietary sector of higher education. CCST represents more than 70 postsecondary schools, institutes, colleges, and universities, which reside not only in this District (and the Division) but across the State of Texas. CCST's express mission is to serve and protect the interests of its members, career education schools of Texas, and their students. By supporting and protecting quality career education schools in Texas, CCST further aims to enable more students to reach their career goals, to provide employers with a large and necessary pool of competitive skilled workers, and to further attract and expand business in Texas.

11.     Defendant U.S. Department of Education is an executive agency of the United States government, 5 U.S.C. §§ 101, 105, subject to the APA, *id.* § 551(1).  The Department, in its

current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668 (1979).

12.     Defendant Miguel Cardona is the U.S. Secretary of Education.  The Secretary is named as a party to this matter in his official capacity as the head of the Department of Education. The Secretary, in his official capacity, is responsible for the Department's promulgation of the challenged regulations and for related acts and omissions alleged herein.

### JURISDICTION & VENUE

13.     This Court has subject-matter jurisdiction because this civil case arises under the Constitution and the laws of the United States, including the APA.  *See* 28 U.S.C. §§ 1331, 2201–2202; 5 U.S.C. §§ 701–706.

14.     This Court has venue because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas.

15.     Texas is home to 2.9 million student loan borrowers, the second largest number of borrowers of any state; these borrowers hold $85.4 billion of student loan debt in 2019, the second largest amount of debt of borrowers in any state.  *See* Zack Friedman, *Student Loan Debt Statistics In 2022: A Record $1.7 Trillion*, Forbes.com (May 16, 2022), https://www.forbes.com/sites/zackfriedman/2022/05/16/student-loan-debt-statistics-in-2022-a-record-17-trillion/.  A significant number of the borrowers who will be subject to the challenged rule reside in this District.

16.     Texas is also home to approximately 346 institutions of higher learning that participate in the Direct Loan Program and will be subject to the challenged rule.  *See* U.S. Dep't of Educ, *2023–24 Federal School Code List of Participating Schools (November 2022)*, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2022-10-31/2023-24-federal-school-code-list-participating-schools-november-2022.

17.     A significant number of those institutions are present in this District, including major institutions like Texas Tech University, Texas Christian University, Southern Methodist University, and the University of Texas-Arlington.

18.     CCST's member schools that reside in this District (and in the Fort Worth Division) and are Direct Loan program participants (collectively, the "Fort Worth Schools") will suffer concrete injury from the Final Rule.

19.     A large number of students and graduates of CCST member schools, especially the Fort Worth Schools, who hold federal student debt and can file borrower defense to repayment claims reside in this District and the Fort Worth Division.

20.     During the 2020-2021 school term alone, the Fort Worth Schools provided employment to hundreds of residents as instructional staff members, and were responsible for providing education and workforce training to more than 5,000 students—of which 66% were female, 29% were Hispanic or Latino, and 29% were Black or African American.

21.     The Final Rule will harm not only the Fort Worth Schools directly, but by extension the local communities they serve.  By constraining educational resources and causing school closures, the Final Rule will deprive communities of essential workers, and students of access to critical career education opportunities.

## STANDING

22.     CCST is harmed and its mission is frustrated and endangered by unlawful agency actions, such as the Final Rule, which not only increase regulatory burdens and compliance costs, but also threaten irreparable and even existential liability for proprietary schools, ultimately reducing access to career education and hindering workforce development.  To the extent such liability will result in the closure of CCST's member schools, the Final Rule would greatly hinder

CCST's operations and effectiveness. Further, there is resulting irreparable reputational harm to CCST, as a prominent representative of the interests of Texas career education schools, which the Final Rule purposely disfavors.

23.     CCST has diverted significant organizational resources to identify and counteract the harms of the Final Rule.  In response to the Department's July 13, 2022 Notice of Proposed Rulemaking (NPRM), CCST joined with over a dozen organizations also representing career and private schools around the country.  The group submitted 137 pages of comments, urging the Department to withdraw the then-proposed rule due to its numerous legal and regulatory deficiencies.  Before and after the publication of the Final Rule, CCST has been working with its members and affiliate organizations to prepare for the future regulatory landscape.

24.     CCST also has associational standing to bring this suit on behalf of its members.

25.     CCST's membership includes more than 70 postsecondary schools, institutes, colleges, and/or universities, of which there are at least 54 that are accredited by a U.S. Department of Education recognized agency, participate in the Ford Direct Loan Program and will suffer concrete injury from the Final Rule—and thus have individual standing to sue in their own right.

26.     CCST's member schools have trained, and are responsible for training, thousands of students to serve in highly demanded skilled professions, including nurses and medical assistants, welders, HVAC repair technicians, and trucking maintenance and automotive technology specialists. These are professions that are essential to not only the communities in this district but the State of Texas as a whole.

27.     CCST's members participating in the Direct Loan Program suffer concrete injury from the Final Rule and have standing to sue in their own right.  Each participating member school is required to conform to the substantive provisions of the Final Rule specifying acts or omissions

that give rise to borrower defenses.  Violations of those provisions subject the school to potential liability for discharged loans, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions upon participation.  *See, e.g.*, 34 C.F.R. §§ 668.71(a), 668.500(b).[1]  Each participant is subject to new and unlawful Departmental procedures that threaten unwarranted reputational injury and enormous financial liability.  The Final Rule requires participating member schools to take immediate or imminent action to avoid reputational harms, liability, and exclusion from (or restrictions upon) participation in the federal student loan program under the Final Rule.

28.     The member interests at stake are germane to the organization's purpose, which includes protecting members from unjust laws and regulations, promoting student access to career education, and serving as an advocate for member interests before governmental bodies.

29.     Neither the claim asserted nor the relief requested requires the participation of individual members in this pre-enforcement challenge.  Each CCST member school that participates in the Direct Loan Program is equally subject to the Final Rule's substantive and procedural provisions, and no facts or legal issues specific to individual CCST members require adjudication to resolve the legal claims presented.

30.     The Final Rule constitutes final agency action and becomes effective on July 1, 2023.  All claims are strictly legal and based on a complete administrative record.  Schools must conform their conduct, recordkeeping activity, and compliance efforts immediately or imminently to avoid reputational injury, potentially substantial financial liability, and exclusion from (or restriction upon) participation in the federal student loan programs.

---

[1] Citations herein to the C.F.R. shall refer to provisions upon codification of the Final Rule unless otherwise stated.  *See* 87 Fed. Reg. 66,039–66,073 (setting forth Final Rule amendments to the C.F.R.).

## BACKGROUND

**I.    The Higher Education Act & the History of the Department's BDR Rules**

31.    The HEA establishes several student loan programs. The three most relevant to this lawsuit are the Direct Loan, Perkins, and FFEL programs.  *See* 87 Fed. Reg. 65,904 (citing 20 U.S.C. §§ 1071 *et seq*., 1087a *et seq*.).

32.    Section 455(h) of the HEA provides, in pertinent part, that:

> [T]he Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan . . . except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h).  The "part" referred to in Section 455(h) is the Direct Loan program, which is part D of Title 20, Chapter 28, Subchapter IV, which sets forth student assistance programs. Thus, the Secretary's authority to promulgate BDR regulations is limited to Direct Loans.

33.    Section 455(h) is a minor provision of the HEA that, in its first two decades of existence, had rarely been invoked.  87 Fed. Reg. 65,980 ("[T]he [borrower defense] process . . . was rarely used prior to 2015."); 81 Fed. Reg. 75,926 ("[The] [s]ection . . . governing defenses to repayment[] has been in place since 1995 but, until recently, has rarely been used.").

34.    Pursuant to the HEA, the Department promulgated borrower defense regulations in 1994, including one stating that where a borrower's defense against repayment is successful, a borrower may be "relieved of the obligation to repay all or part of the loan and associated costs and fees."  34 C.F.R. § 685.206(e)(12)(i).  The Department also announced the standards for permitting a borrower to "assert as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law."  *See* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).

35.     In 1994, the Department's understanding of Section 455(h) was that if the Secretary or other authorized person brings "an action" for repayment, the borrower "may assert as a defense" an institutional act or omission specified in Department regulations.  59 Fed. Reg. 61,696. The Department's 1994 Rule explicitly contemplated that a "defense" would be asserted in existing formal collection proceedings. Indeed, it provided that "[i]*n any proceeding to collect on a Direct Loan,* the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 206(c) (1995) (emphasis added).  The Department commented that "the regulations identify *formal proceedings* in which borrowers may raise the acts or omissions of the school as a defense against collection of the loan," 59 Fed. Reg. 61,671 (emphasis added), which would include "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings under Section 488A of the Act"; "(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. § 3711(f)."  *Id.*

36.     Only after more than 20 years of implementing Section 455(h) and more than 50 years since the passage of the HEA did the Department devise a novel scheme to adjudicate borrower defense "claims" and school liability in the absence of any loan enforcement action.

37.     In 2016, in response to increased borrower defense claims asserted by attendees of the Corinthian Colleges, the Department proposed new regulations ostensibly to "streamline the borrower defense process" that would apply to Direct Loans made on or after July 1, 2017 ("2016 Rule").  *See* William D. Ford Federal Direct Loan Program, 81 Fed. Reg. 39,330, 39,331 (June 16, 2016).

38.     Under the 2016 Rule, schools bore an inequitable burden in defending against borrower defense claims.  For example, the 2016 Rule established for the first time a "group" claim process, whereby the Department could, in its own discretion, initiate the grouping of individual borrower defense claims whenever the Department would determine that there were sufficient factual commonalities between the claims.  Under this group claim process, schools had the onus to rebut the presumption that all members of the group reasonably relied on the alleged misrepresentation or omission.  Further, the 2016 Rule introduced a prohibition on the requirement or enforcement of pre-dispute agreements to arbitrate borrower defense claims and of class-action waivers, even if the provisions were agreed upon in binding contracts prior to the July 1, 2017 effective date.

39.     On account of litigation initiated against the Department, as well as the Department's initiation of a negotiated rulemaking process, the 2016 Rule's effective date was delayed until October 2018.  In 2019, "following consideration of public comments on the 2018 NPRM, the Department published new final borrower defense regulations that applied to loans made on or after July 1, 2020." ("2019 Rule").  *See* William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019).

40.     The 2019 Rule attempted to correct numerous deficiencies in the borrower defense claim adjudication process that existed under the 2016 Rule—namely, the need for due process protections for schools to ensure a borrower defense claim adjudication process that is fair and equitable.  Specifically, the 2019 Rule implemented certain protections against meritless borrower defense claims by instituting the requirement that claimants prove that a school had in fact engaged in a misrepresentation that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth.   Moreover, the 2019 Rule required that the alleged

misrepresentation or omission directly and clearly relate to enrollment or continuing enrollment at the school or to the provision of educational services for which the loan was disbursed. Further, it required the claimant to have actually suffered harm from the alleged misrepresentation or omission.

41.     The 2019 Rule precluded tag-along claims by requiring that the Department consider each borrower claim independently and on a case-by-case basis, thus mitigating the risk of erroneous loan discharge.  Under the 2019 Rule, a requirement to disclose the use of mandatory pre-dispute arbitration agreements and class action waivers replaced the 2016 Rule's blanket prohibition of such provisions.  The 2019 Rule covered loans first disbursed on or after the effective date, July 1, 2020.

42.     The current Administration has made student loan forgiveness one of its top priorities.  The President initially acknowledged that he could not forgive student loan debt by executive fiat.  Cory Turner, *Biden pledged to forgive $10,000 in student loan debt. Here's what he's done so far*, National Public Radio (Dec. 7, 2021) ("NPR Article"), https://www.npr.org/2021/12/07/1062070001/student-loan-forgiveness-debt-president-biden-campaign-promise.  Despite strong political crosswinds, the Biden Administration ultimately announced plans to cancel approximately $500 billion in student borrower debt.  Adam Looney, *Does Biden's student debt forgiveness achieve his stated goals?*, Brookings Institute (Sept. 26, 2022), https://www.brookings.edu/blog/up-front/2022/09/26/does-bidens-student-debt-forgiveness-achieve-his-stated-goals/.

43.     Before announcing its general student loan forgiveness plan, the Biden Administration pursued the same ends by extending or "expanding a handful of programs that were already on the books," including BDR rules.  NPR Article, *supra*; *see also id*. ("'We're working

really hard to get students the relief that they're entitled to' through these preexisting programs," said Under Secretary of Education James Kvaal); Hugh T. Ferguson, *Kvaal Highlights 'Complex' Nature of Efforts to Implement Student Debt Cancellation*, National Association of Student Financial Aid Administrators (July 25, 2022), https://www.nasfaa.org/news-item/27656/Kvaal_Highlights_Complex_Nature_of_Efforts_to_Implement_Student_Debt_Cancellation; Lili Stenn, *U.S. Education Under Secretary Kvaal Outlines Efforts to Expand Student Loan Relief*, Rogue Rocket (Jul. 20, 2022), https://roguerocket.com/2022/07/20/under-secretary-kvaal-expand-student-loan-relief/; James Kvaal (@UnderSecKvaal), Twitter (Apr. 19, 2022) ("Already the Biden Administration has canceled 725,000 entire debts for borrowers in public service, who became disabled, or who were cheated by their colleges – while investing more in Pell grants and college oversight to prevent future abuses.").

## II.   The July NPRM and its Procedural Deficiencies

44.   On July 13, 2022, the Department published in the Federal Register (87 Fed. Reg. 41,878 (July 13, 2022)) a Notice of Proposed Rulemaking ("July NPRM") under the caption of "Student Assistance General Provisions." *Id.*

45.   The July NPRM included the then-proposal to amend regulations governing the administration of loans disbursed pursuant to the Direct Loan program to establish a new borrower defense framework, including a significantly modified process for adjudicating borrower defense claims ("Draft Rule").

46.   The Department's Draft Rule included proposals to prohibit schools from contracting with and entering into mandatory pre-dispute agreements to arbitrate and to forgo class action; to expand the scope and eligibility criteria for loan discharge for reasons of total and

permanent disability ("TPD"), closed school, and false certification; to eliminate interest capitalization where not required by statute; and to ease standards to qualify for the Public Service Loan Forgiveness Program.

47.     The Final Rule substantially adopted each of these proposals.

48.     The publication of the July NPRM followed three public hearings and three negotiated rulemaking sessions.

49.     The Negotiated Rulemaking Committee (the "Committee") reached consensus on the proposed rules for: improving the process for loan discharges due to total and permanent disability; eliminating interest capitalization in circumstances not required under statute; streamlining applications for loan discharge based on false certification; and "establishing a framework for Pell Grant Eligibility for Prison Education Programs."  87 Fed. Reg. 41,882.

50.     The Committee did not reach consensus on the proposed amendments to the borrower defense provisions, including and especially changes to the borrower defense framework—the component of the July NPRM that elicited some of the strongest and most critical comments.

51.     The July NPRM set an August 12, 2022 deadline for comment submissions. 87 Fed. Reg. 41,878.

52.     Many, including CCST and Members of Congress on the U.S. Senate Committee on Health, Education, Labor and Pensions and the U.S. House Committee on Education and Labor (now the Committee on Education and the Workforce), *see* Letter from Sen. Richard Burr and Rep. Virginia Fox to Secretary Cardona (Aug. 12, 2022), https://edworkforce.house.gov/uploadedfiles/8.12.22_foxx_and_burr_to_cardona.pdf, took issue with the Department's refusal to extend the

30-day period, especially given the July NPRM's numerous and complex regulatory proposals, which spanned several hundred pages.  Notwithstanding the Department's refusal to extend the deadline, the July NPRM elicited more than 5,300 public comment submissions, including CCST's comment submission.

53.     A little more than a month following the comment deadline, the Department distributed the proposed Final Rule for interagency review.

54.     The Department ignored significant concerns regarding procedural deficiencies in the July NPRM that necessitated the withdrawal of the Draft Rule, pending necessary corrections. Among other things, there were substantial changes in circumstances that required the Department to redo or to conduct for the first time certain analyses.

55.     Yet the Department did not undertake or include in its July NPRM or Final Rule a proper cost/benefit or budgetary impact analysis. Indeed, the Department altogether failed to take into account the Biden Administration's widespread loan relief programs, which will impact at least 43 million student loan borrowers (which is the majority of the country's federal student loan borrowers) and, further, will incur $600 billion in costs.

56.     The Department ignored these and other concerns, failed to consider meaningfully the thousands of public comment submissions, and proceeded with haste in promulgating the Final Rule on November 1, 2022.

## III.    The Final Rule

57.     The Final Rule articulates new federal standards and processes for adjudicating a claim for borrower defense to repayment of a loan.

58.     The new Final Rule greatly broadens the substantive grounds for relief to borrowers (and liability for schools).  The Final Rule recognizes five grounds on which a borrower defense

claim may be brought: "substantial" misrepresentation under the new uniform federal standard; "substantial" omission of fact; breach of contract; aggressive or deceptive recruitment; or a state or federal judgment or final Department action against an institution that could give rise to a borrower defense claim.  *See* 34 C.F.R. § 685.401(b)(1)–(5).

59.     Under the new standard, a misrepresentation is deemed *substantial* if a borrower reasonably relied upon it or "*could* reasonably be expected to rely" upon it to his or her detriment. 34 C.F.R. § 668.71 (emphasis added).  A *substantial* omission of fact may be "the concealment, suppression, or absence of material information relating to the nature of the institution's educational programs, financial charges, or the employability of the institution's graduates," 34 C.F.R.  § 668.75, but the Final Rule does not exhaustively define the term.

60.     The Department purports to have "incorporate[d] the conventional elements of injury and causation" because the Final Rule requires that in order to approve a claim, the Department "must conclude that the institution's act or omission is an actionable ground for [defense to repayment] that caused detriment to the borrower that warrants relief."  87 Fed. Reg. 65,908.  "In considering whether an institution's acts or omissions caused detriment that warrants this form of relief, the Department would consider the totality of the circumstances, including the nature and degree of the act or omission and of the harm or injury along with other relevant factors."  *Id.*

61.     Even though Section 455(h) applies only to the Direct Loan Program, the Final Rule extends the reach of borrower defenses to borrowers with Perkins and FFEL loans as well, *see* 34 C.F.R. § 685.219(c)(3).

62.     The Final Rule also defines adjudicatory procedures for BDR "claims."  In addition to authorizing individuals to file BDR claims, it permits "group" consideration of borrower defense

claims and establishes a process for grouping and adjudicating such claims based on the existence of "common facts and circumstances."  87 Fed. Reg. 65,998.  The Secretary may initiate a group process upon the Department's own determination, creating a group based on federal or state law enforcement activity, individual claims, and/or lawsuits filed against institutions.  34 C.F.R. § 685.402(a), (b).  The Final Rule also permits state government entities and legal assistance organizations to initiate the group claim process.  87 Fed. Reg. 65,938; 34 C.F.R. § 685.401.

63.    The Department predicts that its "inclusion of third-party requestors from the legal assistance community means the possible number of requests for considering a group claim could be *substantially higher* than anticipated . . . ."  87 Fed. Reg. 65,938 (emphasis added).

64.    For group processes, the Department has established "a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." 34 C.F.R. § 685.406(b)(2).

65.    The Final Rule expanded the types of "evidence" that can prove a borrower defense to include any information submitted with a claim or group application, or possessed by the Department, regardless of whether it is sworn, authenticated, or hearsay.  And "there are situations where the evidence supporting the approval of a borrower's claim could come solely from the application submitted by the borrower."  87 Fed. Reg. 65,939.  Although the regulations provide for an institutional response to an allegation of wrongdoing, the regulations provide no opportunity for the institution to discover or test evidence from the borrower(s) or cross-examine any borrower. 34 C.F.R. §§ 685.405, 685.406(b),(c).

66.     The Final Rule does not provide for partial loan discharge; rather, the Department "will award *a full discharge* for approved claims."  84 Fed. Reg. 65,946 (emphasis added); 34 C.F.R. § 685.408.

67.     Under the Final Rule, borrowers may raise a defense to repayment "at any time," so long as the borrower has a balance due on a Direct Loan or another loan that may be consolidated into a Federal Direct Consolidation loan.  34 C.F.R. § 685.401(b).

68.     The Final Rule provides that borrowers may seek reconsideration of decisions denying their borrower defense claims. Further, the Final Rule permits borrowers to seek reconsideration of a claim under a State law standard if their initial claim is denied. The Department did not afford schools any corresponding opportunity to seek reconsideration of or to appeal an adverse decision of the Department in a borrower defense claim proceeding.

69.     Under the Final Rule, after the Department approves a borrower defense, there is a separate process for seeking recoupment against schools.  The Secretary can seek recoupment through a process that is used for program reviews under part 668, subpart H, during which the ability to submit evidence is circumscribed.  The Final Rule imposes the burden on the institution to disprove the propriety of the discharge and its liability for the amount, but does not provide for discovery or any witness examination.

## IV.     Prohibition On Arbitration and Class Action Waiver Provisions

70.     The Final Rule prohibits schools from agreeing with students to arbitrate and to resolve claims on an individual basis, rather than through class actions.  87 Fed. Reg. 65,953; 34 C.F.R. §§ 668.41, 685.300, 685.304.

71.     Prior regulations permitted arbitration and class action waivers in contracts between schools and students while seeking to "provide students with information that they need to

empower themselves to understand [their] legal rights and available remedies."  87 Fed. Reg. 49,843 (2019 Rule).  For example, previous rules required institutions to "make available to enrolled students, prospective students, and the public, a written (electronic) plain language disclosure of those conditions of enrollment."  87 Fed. Reg. 49,910 (2019 Rule).

72.     According to the Department's 2019 estimate, approximately one-half of participating proprietary institutions agree with students, upon enrollment, to arbitrate potential future disputes and/or resolve them on an individual, case-by-case basis, rather than through class action processes.  *See* 84 Fed. Reg. 49,904 (2019 Rule) ("Of the 1,888 proprietary institutions participating in the title IV, HEA programs, we estimate that 50 percent or 944 will use a pre-dispute arbitration agreement and/or class action waiver and will provide the required information electronically.").

## V.     Closed School Loan Discharges

73.     Under the Final Rule, students whose schools "closed" while or shortly after the students attended may be eligible to have their loans discharged.  The Department will seek to recover funds from the institutions that are subject to this provision.  87 Fed. Reg. 65,913.

74.     The Final Rule affords the Secretary wide discretion to determine the date that the school "closed," which is when the Secretary deems that the school ceased to provide instruction in "most" programs or for "most of its students." More specifically, the Final Rule affords the Secretary discretion to determine that a school's closure date is the earlier of the date that the school ceased to provide instruction in *most* programs, as "determined by the Secretary," or a date chosen by the Secretary "that reflects when the school ceased to provide educational instruction for all of its students."  34 C.F.R. §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), 685.214(a)(2)(i).

75. In addition, the Final Rule empowers the Secretary or a guaranty agency to discharge an FFEL loan "without an application for an [eligible] borrower" where the Secretary or guaranty agency has information that the borrower did not complete an institutional teach-out plan or teach-out agreement at another approved school. *Id.* §§ 674.33(g)(3)(i)(B), 682.402(d)(8)(i)(B) and 685.214(c)(1).

76. The Final Rule also disposes of the current requirement that a borrower may only receive a closed school discharge without an application if the borrower does not enroll in another Title IV school within three years of the prior school's closure date. *Id.* §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii) and 685.214(c)(1).

### THE FINAL RULE EXCEEDS THE DEPARTMENT'S AUTHORITY, VIOLATES THE APA, AND IS UNCONSTITUTIONAL

**I.    The Department Lacks Authority to Fashion the Final Rule's Novel Adjudication System for Loan Forgiveness and Liability Shifting.**

77. Section 455(h) of the HEA provides that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan." 20 U.S.C. § 1087e(h). It is apparent from its face that this provision enables the Department to specify *defenses* to repayment and not to invent *affirmative* claims. Section 455(h) does not grant the Department power to define private or public rights of action.

78. Not only does the Final Rule depart from the statutory text by converting borrower defenses into affirmative claims, it also weaves from whole cloth adjudicatory processes designed to shift liability to institutions without due process or any colorable opportunity to develop a defense.

79. The Department wrongly arrogates to itself a vast and unconventional adjudicatory and loss-recovery authority based on the statute's limited *rulemaking* grant for the precise purpose

of identifying acts or omissions of schools that borrowers can assert as defenses to repayment. Where Congress grants rulemaking powers "to be exercised in specific ways," those limitations must be observed. *Gonzales v. Oregon*, 546 U.S. 243, 259 (2006). Agency power to adjudicate must be expressly authorized by Congress. *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 274 (1996). No such authority has been granted here.

80. Section 455(h) gives the Department rulemaking power *to define* borrower defenses based on institutional acts and omissions; it grants no power to *adjudicate* borrower defenses, much less claims. The power to make rules does not subsume the power to adjudicate violation of those rules. *RLC Indus. Co. v. CIR*, 58 F.3d 413, 417–18 (9th Cir. 1995).

81. Not only is there no textual hook for the Department's novel adjudicatory and liability-shifting scheme, but one would not expect Congress to grant such far-reaching authority on such a slender statutory basis. As the U.S. Supreme Court recently admonished in *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022), the fundamental inquiry into agency authority is "whether Congress in fact meant to confer the power the agency has asserted." Under the major questions doctrine, an act of vast "economic and political significance" must be viewed in light of the "history and the breadth of the authority . . . asserted." *Id.* (internal quotation marks omitted). Just as the EPA could not seize upon an "ancillary" and "rarely used" statute to promulgate major climate change regulations, *id.* at 2610–11, the Department cannot refashion its modest authority to define borrower defenses into a wellspring of power to achieve massive loan forgiveness, a controversial maneuver that may impose billions of dollars of burden on the public fisc. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*) (holding that an economic impact of $50 billion had vast significance). As the Department recognized when it disavowed the power to cancel loan debt e*n masse*, "Congress does not

impliedly delegate a policy decision of massive economic and political magnitude – as blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, or the material modification of the repayment terms or amounts thereof, surely would be – to an administrative agency."  Memorandum from U.S. Dep't of Educ., Off. of the General Counsel to the Secretary of Educ., Betsy DeVos (Jan. 12, 2021) *Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority*, at 2; *see also* 87 Fed. Reg. 65,906 ("[T]he statute does not authorize the Secretary to . . . forgiv[e] all student loans [or] set[] interest rates to 0 percent.").  So, too, Congress did not delegate in obscure fashion the broad debt cancellation powers effectively exercised in the Final Rule.

82.     Moreover, the statute refers to borrower defenses raised "*in any action* arising from or relating to a loan made under this part."  20 U.S.C. § 1087e(h) (emphasis added).  Because an "action" refers to a judicial proceeding, the plain meaning of the statute does not permit the Department to create new administrative proceedings in which borrower defenses may be raised as claims.

83.     Section 455(h)'s grant of rulemaking power also does not authorize adjudication of an institution's liability to the Government for any amount of loans discharged.

84.     The Department claims the authority to adjudicate because Congress has granted it rulemaking authority to "carry out functions otherwise vested in the Secretary," 20 U.S.C. § 1221e–3, and to "manage the functions of the Secretary or the Department," *id.* § 3474.  But Congress did not vest the Secretary with the function of adjudicating borrower defenses to repayment or school liability for loans discharged in borrower proceedings.

85.     Whether to commit public rights to agency adjudication is a decision that belongs exclusively to Congress.  *See Atlas Roofing Co. v. Occupational Safety and Health Review*

22

*Comm'n*, 430 U.S. 442, 452, 460–61 (1977).  Congress has not authorized the Department to create public rights of action or to adjudicate them.

86.     Finally, even if Congress authorized the Department both to create public rights of action and to adjudicate both borrower defenses and school liability, Article III of the Constitution forbids the Department to adjudicate private rights, including breach of contract.  *See also infra*, §§ II.A.3, II.H.

## II.     Critical Components of the Final Rule Are Unlawful.

87.     Not only is the Final Rule as a whole *ultra vires*, but its individual components are unlawful as well, presenting independent grounds on which this Court should vacate and set aside the Final Rule.

### A.     The Department's Definitions of Substantive Borrower Defenses Violate the Statute, the Administrative Procedure Act, and the Constitution.

88.     Section 455(h) authorizes the Department to specify acts or omissions that a borrower may assert as a defense to repayment.  Even if, arguendo, the Department may convert a borrower defense into a borrower claim, the Department's defenses violate the statute or the Constitution (or both) and are arbitrary and capricious.

#### 1.     The Department's Failure to Require Intent for Actionable Misrepresentation is Arbitrary and Capricious.

89.     In Subpart F of the Final Rule, specifically 34 C.F.R. §§ 668.72–74, the Department defines misrepresentation as a borrower defense, and broadly "establishes the types of activities that constitute substantial misrepresentation by an eligible institution."  34 C.F.R. § 668.71(b); *see also* 87 Fed. Reg. 65,920.

90.     The Department's nominal changes to the section defining misrepresentation fail to resolve the deficiencies that were noted in comment submissions and acknowledged by the

Department in both the July NPRM as well as the Final Rule. *See* 87 Fed. Reg. 41,889; 87 Fed. Reg. 65,920.

91.     The Department acknowledged in the July NPRM that "substantial misrepresentations constitute most of the claims that the Department has approved to date and have consistently served as a basis for borrower defense discharges across the several sets of regulations." 87 Fed. Reg. 41,889.  The new Final Rule eliminates most of the elements that have comprised a misrepresentation claim, including that the alleged misrepresentation was made with intent.  Instead, the Final Rule defines a misrepresentation broadly as:

> Any false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to mislead under the circumstances.

34 C.F.R. § 668.71(c).

92.     The Department should have restricted the defense to only *intentional* misrepresentations.  Instead, the Final Rule imposes liability for any erroneous representation, however inadvertent.  This strict-liability rule of misrepresentation is arbitrary and capricious and cannot stand.

93.     First, the Department claims that "[r]equiring intent would place too great a burden on an individual borrower." 87 Fed. Reg. 69,521.  However, the Department overlooks the practical realities: intent is a common element of proof throughout the law; intent is often proven through circumstantial evidence; an institution's response to a claim could provide relevant evidence; and a finder of fact can make inferences from the totality of evidence presented. Eliminating the intent element in order to facilitate relief to a borrower is not justified.  The

Department gives no reasoned explanation why this context is so different from others where individual plaintiffs must prove institutional intent. Nor does the Department give a reasoned explanation why a school should have liability for discharged loans without any proof of culpability (not even, for example, negligence).

94.    Absent a meaningful intent requirement, the Final Rule effectively imposes a strict liability regime on schools—one in which a borrower can discharge her loans based on allegations of a single statement "likel[y] . . . to mislead."  Many schools may not survive such liabilities and would be forced out of business (especially if subject to group claims), to the detriment of their students and communities over the long run.

95.    Second, the Department notes that "if the action resulted in detriment to the borrower that warrants relief, the Department does not believe whether it was taken with knowledge or intent should be relevant."  87 Fed. Reg. 65,921.   But that justification does not withstand scrutiny because the Department will presume the existence and causation of detriment without proof in two of the most common circumstances where relief is likely to be granted (group claims and closed school discharges).  Additionally, the Department watered down the requirement to show detriment such that a claim "may be based on an inference of causation that does not meet the strictures of a conventional common law fraud claim."  87 Fed. Reg. 65,922.

96.    The Department uses its new misrepresentation standard not only to grant relief to injured borrowers, but to fine schools and revoke, restrict, or deny their participation in the federal student loan program even without proof of borrower detriment.  34 C.F.R. § 668.71(a).  It is arbitrary and capricious to authorize the sanctioning of a school for innocent and unintentional misstatements of fact.

### 2.   The Department's Freestanding "Omission of Fact" Defense Violates the Statute and Is Arbitrary and Capricious.

97.     An omission of fact is a misrepresentation under Section 668.71 "if a reasonable person would have considered the omitted information in making a decision to enroll or continue attendance."  34 C.F.R. § 668.75.

98.     The Final Rule's misrepresentation defense separately includes misrepresentations based on omission that make other statements misleading.  *See* 34 C.F.R. § 668.71(c) ("Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading.").

99.     In the Final Rule, the Department has created a novel, open-ended borrower defense based on inadvertent or unanticipated nondisclosures, even where there was no prior duty of disclosure and no breach of good faith.  The Department's newly fashioned duty to disclose arises merely upon retrospective proof that a borrower would have "considered" the fact in a borrowing or enrollment decision.  The absence of such information is actionable even if its absence did not render any actual misrepresentation misleading, even if the fact was objectively unimportant, and even if the omission was wholly accidental.  The new standard based on what a prospective student would "consider" is vague and unworkable, fails to create a concrete standard of conduct for schools, and is arbitrary and capricious.

100.    The Department's freestanding omissions rule is not within the scope of Section 455(h).

101.     In authorizing the Secretary to specify borrower defenses to contractual repayment obligations based on omissions by the school, Congress drew upon a long tradition of contractual defenses based on omission.  Absent a relationship of trust and confidence, an omission provides a contractual defense only when a party knows that the other party will be misled: *i.e.*, knowledge

that (1) nondisclosure will make a prior representation fraudulent or material; (2) that nondisclosure will not correct another's mistake of fact, if nondisclosure is contrary to principles of good faith and fair dealing; and (3) that the other person is mistaken as to some fact as to the content or effect of the instrument. *Restatement (Second) of Contracts* § 161 (1981).

102.    The Department acknowledges that an omission must be misleading to be a misrepresentation. 87 Fed. Reg. 65,925 (noting that Section 668.75 "incorporate[s] the definition of misleading conduct from part 668, subpart F, which requires that the omission make the school's interaction with a borrower misleading under the circumstances"). But by failing to define the omissions that can justify rescission of loan obligations, the Department has failed to "specify in regulations *which* acts or *omissions* of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." 20 U.S.C. § 1087e(h) (emphasis added). Consequently, the omissions rule cannot flow from the statute, which authorizes only defenses based on specified omissions.

103.    The Department's omissions rule is also arbitrary and capricious. It imposes unreasonable duties upon institutions at pain of potentially existential liability. An inadvertent failure to disclose potentially triggers liability to the entire "affected" cohort and for the full amount of their loans. Liability could be in the millions of dollars (even hundreds of millions for larger institutions) for an inconsequential and inadvertent omission. Omissions of fact are also grounds for fining schools or revoking, restricting, or denying their participation in the federal student loan program. *See* 34 C.F.R. § 668.71(a), (c).

104.    The Department provided no rational explanation justifying this arbitrary and capricious rule, which imposes amorphous duties that no school can meet.

105.    The Department defends the open-ended disclosure duty on the ground that it is paired with a requirement of borrower injury, 87 Fed. Reg. 65,925, but for group and closed-school claims, that fact is presumed and need not be proven.  Thus, the injury requirement cannot justify the open-ended "omissions" defense to repayment, which broadly applies to individual, group, and closed-school claims.

### 3.    The Department's "Breach of Contract" Defense Does Not Define "Acts and Omissions" as the Statute Requires and Is Constitutionally Infirm.

106.    The Final Rule creates a defense to repayment where "[t]he institution failed to perform its obligations under the terms of a contract with the student and such obligation was undertaken as consideration or in exchange for the borrower's decision to attend, or to continue attending, the institution, for the borrower's decision to take out a covered loan, or for funds disbursed in connection with a covered loan."  34 C.F.R. § 685.401(b)(3).

107.    It is common practice for students to sign enrollment agreements, *i.e.*, binding contracts between student and school.

108.    The power to resolve contract disputes must be expressly authorized by Congress and is not authorized in these circumstances.  *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 234–35 (1995).

109.    Similarly, because breach-of-contract claims are not public rights and litigants have a right to a jury trial of such claims in federal court, the Department's rule also violates Article III and the Seventh Amendment.  *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 490–91 (2011) (finding that that a State law counterclaim was not a public right); *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 51–52 (1989) ("[Congress] lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").

28

110.    By establishing its own peculiar BDR right of action for contract breach, the Department impermissibly abrogates State law rights.  First, the Department is creating its own law of borrower recovery from contract breaches, even though the latter is governed by specific State law.  This effectively allows the Department to pre-empt state contract laws by awarding a form of consequential discharges to borrowers who have not shown any cognizable damages that are causally connected to a breach, or established their efforts to mitigate or avoid such damages.

111.    Second, the Department has abrogated an important State law right of institutions derived from statutes of limitations, which can vary depending on the state and the type of contract. Under the Final Rule, borrowers face no limitations period for bringing a BDR claim for breach of contract potentially even decades after the borrower has ceased enrollment.  BDR claims will now be brought for contract breaches even when State law causes of action for breach are extinguished.

112.    Third, contracts may generally be enforced only by parties or, in carefully delineated circumstances, third-party beneficiaries, and are typically enforced before judges and juries in adversarial judicial proceedings between plaintiffs and defendants in which all claims, defenses, and remedies are resolved after discovery of relevant facts.  The Department has no grounds to subject contract disputes to impermissible bifurcated proceedings involving no discovery, a series of presumptions that are not grounded in State law, and procedures designed to prejudice the rights of institutions.

113.    The Final Rule is also arbitrary and capricious because it provides for adjudication of contract rights by any designated Department official, not even an administrative law judge.

114.    To the extent the Department's decisions will follow state law, the Final Rule will require the agency to interpret and apply the state laws of every jurisdiction in the United States—

a task it has no competence or expertise to perform.  *See* 81 Fed. Reg. 75,957 (acknowledging the "significant burden" that reliance upon State law places on Department officials).  To the extent the Department will not adhere to state law, the Final Rule violates principles of federalism and the Tenth Amendment.

### 4.     The Department's "Aggressive Recruitment" Defense Violates the Statute and Is Arbitrary and Capricious.

115.    The Final Rule includes a new standalone basis for borrower defense: aggressive and deceptive recruitment conduct or tactics.  The Final Rule defines aggressive recruitment only by example, such as where a school "pressure[s] the student . . . to make . . . decisions immediately" or "engage[s] in unsolicited contact . . . after the student . . . has requested not to be contacted." 34 C.F.R. §§ 668.501(a).   Any form of aggressive and deceptive recruitment practice now constitutes a defense of repayment.  The borrower need not even prove that the alleged aggressive recruitment practice was antecedent to the relevant lending or attendance decision, or involved misrepresentation.  *See, e.g.*, 84 Fed. Reg. 65,928 (defending "aggressive recruitment" as a "pathway to relief" precisely when there are no misrepresentations).

116.    The Department's use of a non-exhaustive list of examples in Section 668.501 without an overarching definition constitutes an abdication of the Department's statutory duty to specify which acts or omissions give rise to a borrower defense.  The result renders institutions vulnerable to liability based on amorphous and highly subjective standards.  For example, the Final Rule does not explain how the Department intends to assess what might constitute improper "pressure" or how to assess the reasonableness or credibility of a student's subjective assertion that he or she felt pressured.

117.    The vagaries of the aggressive recruitment provision are multiplied by the group claim process and the Department's presumption that everyone in the group was affected by

aggressive recruiting.  Given that the grounds for asserting an aggressive recruitment claim are numerous, highly subjective, and dependent on individualized facts (*e.g.*, what the prospective student knew about postsecondary education processes and what the recruiter knew about the prospective student's knowledge), the Department cannot simply bypass fact-finding in favor of a presumption that all members of a group are entitled to a discharge.  Rather, the Department must determine an aggressive recruitment claim based on individual proof and on an individual basis.

> **5.  The Department's Defense Based on a Prior Judgment Against an Institution Under Any State or Federal Law Expands the Borrower Defense Framework Beyond the Statute.**

118.    The Final Rule recognizes the following as an additional basis for a borrower defense claim:

> The borrower, whether as an individual or as a member of a class, or a governmental agency has obtained against the institution a favorable judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction based on the institution's act or omission relating to the making of covered loan, or the provision of educational services for which the loan was provided.

34 C.F.R. § 685.401(b)(5)(i).  Critically, the standard would apply regardless of whether the judgment was obtained by the borrower as an individual or member of a class, or was obtained by a State's Attorney General or other governmental agency.  According to the Department, the defense could apply even to a nondefault, contested "judgment[] obtained against an institution based on any State or Federal law . . . whether obtained in a court or an administrative tribunal of competent jurisdiction."  87 Fed. Reg. 65,932.

119.    This provision of the Final Rule violates the statute. Section 455(h) provides that "the Secretary shall specify in regulations which acts or omissions . . . a borrower may assert as a defense."  20 U.S.C. § 1087e(h).  A judgment against an institution is not an "act or omission" of an institution.  Furthermore, judgments can be based on an indeterminate number of acts or omissions of institutions that happen to violate Federal law, State statutory or regulatory law, state

common law, municipal law, or even foreign law.  The Department has thus abdicated its duty to specify the acts or omissions and has failed to analyze why such acts justify relief, which is the expert decision that Congress delegated to the Secretary.

120.    To permit any judgment based on any Federal or State law to serve as the basis for a borrower defense claim would defeat the purpose of the borrower defense provisions, which require the Secretary to evaluate and specify which acts or omission of the institution justify loan discharge. And, for the same reasons discussed with regard to breach of contract, the Department does not have authority to supplant State law or other Federal laws it does not administer by creating additional liability or relief and overriding legal restrictions on relief.  Nor may it effectively extend any applicable statute of limitations. This is yet another example of an amendment designed to ensure increased loan discharges and administrative recoupment, regardless of whether the grounds for the underlying claim are attenuated or meritless.

121.    The Department's rule also offends longstanding principles of claim preclusion. A prior judgment "prevents litigation of *all grounds for*, or defenses to, *recovery* that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 140 S. Ct. 1589, 1594–95 (2020) (emphasis added) (quoting *Brown v. Felsen* , 442 U.S. 127, 131 (1979)).

122.    The Department attempts to disregard claim preclusion by the ruse of bifurcating proceedings so that the BDR claim is brought only against the Secretary, with the Secretary then recouping liability from the school.  But in substance, the BDR operates prospectively to impose liability on the institution for any discharge granted to the borrower.  It is at a minimum arbitrary and capricious to trample on the institution's rights of repose in a judgment. And there is no reason for the Department to grant additional relief when the court that issued the judgment presumably

granted the plaintiff the full relief to which they were entitled after evaluating the facts and the nature of the legal violation.

123.    If the borrower has already received a judgment for a particular violation of law, that should be *res judicata* and the end of the matter, regardless of whether the borrower might reap more benefits for the same act or omission. A judgment may also preclude re-litigation of issues, but issue preclusion should be applied neutrally whether it benefits the borrower or the institution.

      **6.**    **The Department's Defense Based on Departmental Adverse Actions Exceeds Its Statutory Authority and Violates the Constitution and the APA.**

124.    The Final Rule defines a borrower defense where "[t]he Secretary sanctioned or otherwise took adverse action against the institution" in certain program review proceedings "based on the institution's acts or omissions that could give rise to a borrower defense claim" under the new federal standard. 34 C.F.R. § 685.401(b)(5)(ii).

125.    The Secretary's sanction or adverse action cannot qualify as a borrower defense under Section 455(h) because it does not "specify in regulation *which* acts or omissions of an institution of higher education a borrower may assert as a defense." 20 U.S.C. § 1087e(h) (emphasis added).

126.    Additionally, the Final Rule does not require that the Department's action satisfy the standards for a borrower defense claim—only that the adverse Department decision was "based on . . . acts or omissions that *could* give rise" to a borrower defense claim under one of the other provisions. 34 C.F.R. § 685.401b)(5)(ii) (emphasis added). Even if it did, it would simply be redundant.

127.    The Department's purpose appears to dispense with any need to prove a borrower's defense by creating a novel form of issue preclusion. As the Supreme Court has explained,

collateral estoppel applies to agency action only "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *United States v. Utah Const. & Min. Co.*, 384 U.S. 394, 422 (1966). Not only does Section 455(h) not authorize the creation of new rules of issue preclusion across proceedings, but the regulation violates fundamental principles of collateral estoppel, which are grounded in due process. *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971).

128.    The Final Rule deprives institutions of a full and fair opportunity to litigate the borrower defense aspect of the "adverse action."

129.    The Final Rule does not guarantee notice to the institution that the Department action may subsequently be used to determine a borrower defense claim.

130.    The adverse actions on which the Secretary relies can be non-adjudicative, such as an audit or a program review. The Final Rule effectively makes a non-adjudicatory adverse finding conclusive in a subsequent adjudication. The Final Rule thus violates the principles of collateral estoppel that are fundamental to agency practice and due process.

### 7.    The Department's Newly Established Defense Based on Any State Law Violation Exceeds its Statutory Authority and Violates the Constitution and the APA.

131.    For loans disbursed before July 1, 2017, the Final Rule also permits a borrower to seek reconsideration under state law, if the school "committed any act or omission that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law without regard to any State statute of limitations." 34 C.F.R. § 685.401(c).

132.    This defense violates Section 455(h) because it does not specify which acts or omissions give rise to a borrower defense to repayment. The Secretary must determine what acts

or omissions justifies rescission of contractual repayment obligations and cannot depend upon the vagaries of state law, which creates an inconsistent and fluctuating federal standard.

133.    Furthermore, the Department lacks statutory and constitutional authority to adjudicate state causes of action, which are not federal public rights.  Adjudication of state-law causes of action violates Article III and, for actions for which there is a right to jury trial, the Seventh Amendment.

134.    The Department's abrogation of state statutes of limitations is without statutory authority, is arbitrary and capricious, and violates due process, principles of federalism, and the Tenth Amendment.

**B.    The Department's Creation of Substantive Presumptions Exceeds its Statutory Authority and Violates the APA and the Due Process Clause.**

135.    The core, irreducible meaning of institutional "acts or omissions" giving rise to a borrower's "defense to repayment" under Section 455(h) is that the act or omission must make it inequitable for the borrower to be held to perform his or her contractual repayment obligations.

136.    The Department has recognized this principle in defining a "borrower defense to repayment" as an act or omission of a school relating to enrollment or borrowing "that caused the borrower detriment."    34 C.F.R. § 685.401(a)(ii) ("Borrower defense to repayment"). Furthermore, because the Department has resolved that any borrower defense entitles the borrower to a total discharge of the loan, the detriment must "warrant[] relief" of total forgiveness of outstanding borrower debt and reimbursement of amounts previously paid on the loan.  *Id.*

137.    That injury requirement is the crux of any Section 455(h) defense, and particularly so given the Secretary's specification of actionable acts or omissions.  The Secretary has defined acts or omissions broadly and categorically to cover any act or omission that might conceivably negatively affect a given borrower.  For example, actionable misrepresentations can include

erroneous statements about "*any . . . fact* related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study" or "the existence of contracts with specific externship sites."  34 C.F.R. § 668.72(k), (p) (emphasis added).  It would be absurd to award a borrower full discharge of loans and reimbursement of all past loan repayments if the act in question did not cause the borrower detriment warranting such relief.  Nonetheless, the Department does not require proof of detriment warranting relief in two common circumstances in which borrower defenses will be adjudicated: group claims and closed-school claims.

138.    For any group claim "for which the Department official determines that there may be a borrower defense under § 685.401(b), there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable."  34 C.F.R. § 685.406(b)(2).

139.    Furthermore, "[f]or borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section."  34 C.F.R. § 685.401(e).

140.    The Department has no statutory authority to create such presumptions.  The Department's limited rulemaking authority under Section 455(h) extends only to specifying institutional acts or omissions that can serve as borrower defenses to loan repayment, not defining rules as to how defenses may be proven.

141.    Furthermore, even if such authority exists, it is arbitrary and capricious for an agency to create rebuttable presumptions where there is no rational nexus between proven and

presumed facts (*i.e.*, where proof of one fact does not render so probable the existence of a second fact that it is unnecessary to prove it). *See, e.g.*, *Chemical Mfrs Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703–05 (D.C. Cir. 1997).

142.    Under the group-claim presumption, a presumption of detriment warranting relief arises simply if the Department official finds that an act or omission occurred.  Proof of an act or omission does not logically mean that any borrower was detrimentally affected by it, much less that all borrowers were.  Nor is it logical to infer, upon proof of any detriment, that the detriment warrants total forgiveness of debt and reimbursement of past payments.

143.    Furthermore, it is arbitrary and capricious, and contrary to due process, for the application of a certain procedure to affect substantial rights.  The fact that a particular borrower's claim is adjudicated in a group rather than an individual proceeding should not affect the outcome or reduce the proof required.

144.    It is also arbitrary and capricious to apply a special presumption when the borrower attended a school that is now closed (which can happen for innumerable reasons). There is no logical nexus to presume that any proven detriment to a borrower renders so probable that the relief warranted because of an act is full forgiveness of the loan and reimbursement of past loan repayments, simply because the school is closed.  Whether the borrower suffers detriment, and whether that detriment warrants full relief, is information solely in possession of the borrower and should be proven; there is no need or justification for a presumption simply because the school has closed.

145.    The very notion of a borrower "defense" implies that the borrower should bear the burden of proof, but by creating a presumption, the Department has effectively removed any requirement of proof of the full defense.

146.    Although the presumption is nominally rebuttable, the Department's processes provide no opportunity for rebuttal.  The borrower-defense phase of the proceeding is not an adversarial adjudication where the institution can discover facts from the adversary and introduce them at trial.  The institution is limited to providing a response to the borrower's claim in Section 685.405, but the institution will not generally have possession of evidence relevant to rebutting the presumption of causation and extent of borrower injury.  The Department is not adversarial to the borrower, and nothing in the Final Rule calls for the Department to discover or investigate evidence relevant to rebutting the presumption.

147.    Furthermore, if a recoupment proceeding is brought against a school, no mechanism is provided to enable the school to rebut the presumption.  The Final Rule does not permit a school in a recoupment proceeding to take discovery, at trial or otherwise, even though the borrower ostensibly possesses evidence regarding the causation and extent of injury.  The presumptions are rebuttable in name, but not in practice. These are not *bona fide* evidentiary presumptions, but impermissible policy presumptions to maximize loan forgiveness for borrowers.

**C.    The Elimination of a Limitations Period is Unlawful, Arbitrary and Capricious, and Violative of Due Process.**

148.    The Department compounded its unlawful conversion of "borrower defenses to repayment" into actionable borrower claims by providing that no BDR claim shall be subject to a limitation period.  87 Fed. Reg. 65,935.  Thus, into perpetuity, a borrower is free to bring a claim dating back to 1994, the date of the first borrower defense to repayment rule.

149.    Limitations periods are "'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Cunningham v. M & T Bank Corp*., 814 F.3d 156, 164 (3d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Order of R.R. Telegraphers v.*

*Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)).  The types of claims that comprise the Final Rule causes of action—*e.g.*, claims sounding in fraud, tort, and contract—are routinely subject to statutes of limitations in other contexts, as they should be here.  But the Department's rule allowing any borrower with an active loan dating from 1994 onward to file a BDR claim—including for amounts paid years before—violates this well-established principle.  It is thus arbitrary, capricious, and fundamentally unfair, in violation of due process.

150.    The Department has no authority to determine whether or not limitations periods should apply to borrower defense claims; Section 455(h) authorizes only that the Department may specify institutional acts or omissions that give rise to a borrower defense to repayment.

151.    Eliminating a limitations period is incompatible with—indeed, likely renders unworkable—the Department's BDR claim adjudication process.  The Department states elsewhere that its framework "will ensure institutions have ample opportunity to respond" and "to present their evidence and arguments before an independent hearing official in an administrative proceeding."  87 Fed. Reg. 65,912.

152.    Yet, the Department fails to acknowledge that schools, faced with responding to cases that may be decades old, will be substantially hampered in their ability to proffer evidence and present a defense.  The lack of a limitations period will prevent schools from participating in the BDR response process and contributing to the "complete record" the Department purportedly desires, 87 Fed. Reg. 41,901, as documentary and testimonial evidence frequently will be unavailable. Where evidence is unavailable due to the passage of time, it may be impossible for schools to disprove borrower claims that they were misled, that a school breached an education contract, or that a school engaged in "aggressive recruitment," along with other theories included in the Department's expansive rule.  (The Department also states that it "has the ability to request

39

additional information from either the borrower or institution as needed," assuming that such information would exist, which, for aged claims, is unlikely.  87 Fed. Reg. 65,939.)

153.   The elimination of a limitations period is inconsistent with the Department's rationale for affirming a three-year record retention requirement. In discussing schools' record retention obligations, and whether the three-year period is compatible with the Final Rule's lack of a limitations period, the Department surmised that the financial aid records that must be retained under the Final Rule are "unlikely . . . [to] be the most relevant records in question to adjudicate the BD claim." 87 Fed. Reg. 65,941.  Rather, according to the Department, more relevant evidence would be "related to recruitment and admission practices, advertising campaigns, brochures, and handbooks."  *Id.*  Yet, while simultaneously claiming that schools subject to BDR claims "have kept poor records," 87 Fed. Reg. 65,935, the Department provides no explanation as to why it is reasonable to expect that schools would have maintained these manuals or brochures indefinitely (particularly when these records were not within the scope of Title IV records retention requirements), or why it is reasonable to expect them to do so in the future.

154.   Further, notwithstanding the Department's speculation that "the financial aid records of individual borrowers" are unlikely to be germane to defending a BDR claim, schools facing the possibility of BDR claims well into the future will confront two problematic options: (a) retaining such records long-term out of an abundance of caution in the event that they are relevant to a BDR defense, and (b) disposing of such records as a matter of the Department's student privacy and data security best practices.

155.   The Department excuses its open-ended claim adjudication process by asserting that "the passage of time would also affect the evidence that could be available in favor of the claim." 87 Fed. Reg. 65,935.  But the Department does not consider how the passage of time may

not burden both sides equally. For example, the borrower need not retain documents or records because, as the Department contemplates elsewhere, claims tend to center on the borrower's "story." 87 Fed. Reg. 41,890. Additionally, that the borrower has the burden to show evidence that meets the BD standard, 87 Fed. Reg. 65,935, is not persuasive in light of the other inequitable provisions and presumptions adopted by the Final Rule. And, in any event, the existence of a standard for approving claims does not distinguish this claims process from any other; there is no reason that borrowers should have an indefinite timeline to bring a claim.

156.    In its July NPRM, the Department attempted to explain that institutions do not need the protections of a limitations period because "[o]ther elements of the proposed regulations would protect institutions from concerns about a lack of relevant records to respond to a borrower's claim." 87 Fed. Reg. 41,902. Contrary to the Department's terse argument, the six-year limitations period on recoupment will not "provide[] adequate protection for institutions." 87 Fed. Reg. 41,913; *see also* 87 Fed. Reg. 65,935. Even when a six-year limitation applies to recoupment proceedings,[2] the claim can assert wrongful acts or omissions without time limitation. Schools must face the costs of defending against stale claims during the initial adjudication process without sufficient evidence, and the reputational harm that will ensue if these stale claims are routinely granted, including *en masse* through the group process. Further, the taxpayers will bear the massive burden of funding BDR claims that are granted because schools are unable to put forth defensive evidence at the borrower adjudication stage, and which are so aged that they fall outside of the six-year recoupment limitations period.

---

[2] The six-year limitations period for recoupment proceedings has several exceptions, which substantially undermine these purported "protections." For example, all the Department has to do notify the institution that a BDR claim is pending within the six-year period, and the limitation period does not apply to certified classes or pending state or federal investigations. *See* 34 C.F.R. § 685.409(c)(2), (3).

157.     The Department went so far as to contend that, because it intends to notify schools through the institutional response process of the claims against them, the schools will therefore have "sufficient notice to retain pertinent records."  87 Fed. Reg. 41,902.  But this is an oversimplification that fails to address that claims may be many years old and that schools may receive notice long after claims are filed; by then, it may be impossible to "retain" already long-lost records pertinent to those stale allegations.

158.     The Department's rationale for disposing of a limitations period for borrower defense claims is heavily tied to the "operational challenges of administering a limitations period." 87 Fed. Reg. 65,935.  The Department argued in the July NPRM that applying a limitations period "would not align with the Department's proposal to allow group claims," *id.*, ignoring that class action claims (a form of group claim) are subject to statutes of limitation.  *See, e.g.*, *Lewis v. Becerra*, No. CV 18-2929 (RBW), 2022 WL 1262122, at *8, 12 (D.D.C. Apr. 28, 2022) (concluding that "the number of putative class members in this case should be reduced to account for those individuals who … did not file their claims within the applicable statute of limitations window").

159.     The Department worries about "a situation in which a borrower is still obligated to repay a loan . . . solely because the individual did not fill out an application in time."  87 Fed. Reg. 65,935 (footnote omitted).  That a limitations period may interfere with the Department's policy goals, which could be said of any limitations period, is not a basis to ignore this fundamental procedural protection.

160.     It is neither rational nor lawful for the Department to shirk its responsibility to adjudicate claims fairly and timely, while increasing exponentially the number of claims schools must defend, on the ground that adjudication is burdensome.

D.   **The Group Process Regulation Violates the Statute, Is Arbitrary and Capricious, and Violates the Due Process Rights of Schools.**

161.   The Final Rule resurrects and then expands the flawed group adjudication process from the 2016 regulations.  *See* 34 C.F.R. § 402; 87 Fed. Reg. 65,936-65,939.  This component of the Final Rule exceeds the Department's statutory authority, is arbitrary and capricious in violation of the APA, and violates the due process rights of schools.

162.   The group process provisions conflict with the HEA.  Not only does the Department lack any adjudicatory authority, but *a fortiori* Congress did not grant the Department the authority to promulgate or administer group or class action procedures.  *See West Virginia*, 142 S. Ct. at 2609 ("Agencies have only those powers given to them by Congress.").

163.   Quite the contrary, Congress authorized the Department merely to specify which "acts or omissions" "a borrower may assert as a defense."  20 U.S.C. § 1087e(h).

164.   Nothing on the face of the statute authorizes the Department to consider borrower defense claims on a group basis.  Indeed, the same statute defines a "borrower" as "an individual who is a new borrower on the date such individual applies for a loan under this part . . . ."  20 U.S.C. § 1087e(f)(4).

165.   Moreover, courts must presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted).  Resolving claims through group or class action procedures is a significant policy decision in multiple ways.  First, as the Department recognized in the course of rescinding group procedures in the 2019 regulations, "a group discharge process could place an extraordinary burden on both the Department and the taxpayer."  83 Fed. Reg. 37,244 (July 31, 2018).  Second, the Department itself admits it will disproportionately burden the public fisc, by acknowledging that most of the cost of the new regulations will arise from the granting of group

claims.  *See* 87 Fed. Reg. 65,994–65,996.  Congress cannot be presumed to delegate by silence such a major decision to the Department.

166.    Even if the Department has the statutory authority, the Department's group procedure to adjudicate claims is inconsistent with section 455(h) because it provides no mechanism for the determination of whether an individual borrower was in fact injured and to what extent the borrower was injured for purposes of the amount of discharge.

167.    The group process regulation is also arbitrary and capricious.  As an initial matter, there is no reasoned basis for a group process.  There is no evidence that a group or class action procedure "will ensure a more efficient process."  87 Fed. Reg. 65,993.  Rather, if a common issue is resolved after full and fair litigation in an individual proceeding, re-litigation of that issue could be precluded in subsequent proceedings against the school through ordinary principles of collateral estoppel, thereby minimizing litigation costs.

168.    The Department has implied that it will grant a higher rate of borrower defense claims through a group process.  *See* 87 Fed. Reg. 66,010–66,012.  That is a wholly improper rationale for adopting a group procedure: procedural changes are not supposed to alter substantive outcomes.  *See, e.g.*, 28 U.S.C. § 2072(b) (Federal Rules Enabling Act providing that procedural rules, including class action rules, "shall not abridge, enlarge or modify any substantive right").  That divergence in predicted approval rate also indicates that the adoption of the group procedure is in fact an alteration of the substantive standard for the approval of a borrower defense claim.  Indeed, the presumption of reliance is in fact different for group claims.

169.    The true nature of the group process as simply a means to grant broader relief to borrowers is revealed by the extraordinary provision that if a group claim is not resolved within one year, "the loans, or portion of the loans in the case of a Direct Consolidation Loan, will not be

enforceable by the Department against the borrower."  34 C.F.R. § 685.406(g)(5).  Thus, the Department will discharge student loan debt even without any proof of a borrower defense to repayment, in direct contravention of Section 455(h).

170.    The Department's group process also fails to specify adequate criteria for when a group process is appropriate. The Final Rule permits the Department to institute a group process "[u]pon consideration of factors including, but not limited to, the existence of common facts and claims by borrowers, the likelihood of actionable acts or omissions that were pervasive or widely disseminated, and the promotion of compliance by an institution or other title IV, HEA program participant."  34 C.F.R. § 685.402(a).  The only justification for a group procedure would be if common issues predominate and if the procedure provides a fair and efficient means of resolving common issues while respecting matters that require individualized proof.  In contrast, the Department's open-ended criteria are arbitrary and capricious.

171.    Further, it is arbitrary to determine whether to proceed on a group basis in a present proceeding based on whether doing so will affect a regulated party's behavior in the future.  That is especially true because the Department elsewhere estimated that the effect of its regulations on behavior is minimal in the short-term.  *See* 87 Fed. Reg. 66,014–66,015.

172.    Additionally, the group process regulation arbitrarily restricts the opportunity for institutions whose rights will be affected to object to group formation.   Only if a third party, not the Secretary, proposes a group process can institutions then object. 34 C.F.R. 685.402(c)(4).  In cases where the Secretary *sua sponte* forms a group, institutions are completely denied the opportunity to be heard at the equivalent of the class-certification stage.

173.    Despite numerous issues critical to a borrower defense claim, including reliance, injury, and damages, involve individualized issues of proof, the Department has jettisoned any of

the protections common to class-action procedures, such as those embodied in Rule 23 of the Federal Rules of Civil Procedure.  The Department's group process impermissibly fails to limit class-like procedures to common issues and ensure separate determination of matters that require individualized proof.

174.    The Final Rule's group process regulation accordingly is arbitrary and capricious and contravenes due process, which requires that a party be able to present a defense to allegations of wrongdoing.  *Degen v. United States*, 517 U.S. 820, 828 (1996); *Hovey v. Elliott*, 167 U.S. 409, 433 (1897).  That includes presenting individualized evidence on matters of individualized proof. *See, e.g.*, *Western Elec. Co, v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976).

175.    One need look no further than the Department's own discussion of the timeline for adjudication of a group claim to see that the Department plans to gloss over individualized issues in the group process.  The July NPRM proposed asymmetrical timelines in which group claims would be adjudicated in two years but individual claims, three years.  The Department reasoned, "Individual claims would be subject to a longer adjudication timeframe because they may include case-specific research on the merits."  87 Fed. Reg. 41,904.  Then, in the Final Rule, the Department actually "shorten[ed] the time to render a final decision on the group claim to 1 year." 87 Fed. Reg. 65,938.  The obvious implication is that the Department intends to rush through group adjudication to grant bulk loan forgiveness without conducting too much "research on the merits." The Department's own estimates—that only 12% of individual claims will be approved while 75% of group claims will be approved, 87 Fed. Reg. 41,959 (Table 5)—corroborate these concerns.

176.    Indeed, on the issues of reliance and the fact and extent of injury, the Department simply relieves the borrowers of any need to adduce proof.  Instead, it erects the "rebuttable presumption" that "the act or omission . . . affected each member of the group in deciding to attend,

or continue attending, the institution, and that such reliance was reasonable." 34 C.F.R. § 685.406(b)(2). As noted above, *see supra* ¶¶ 129–142, there is no lawful basis for that presumption, and there is no mechanism by which the presumption can be rebutted in a proceeding.

177. The Department's slanted and results-driven proceeding cannot satisfy due process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). Because borrower-defense liabilities are potentially massive, the private interests at stake are substantial. The risk of error in determining borrower defenses is high, and the value of standard safeguards—such as reserving matters of individualized proof for individualized proceedings—is substantial. Any additional administrative cost to the Government is more than justified by the avoidance of waste of substantial government funds from granting unjustified loan discharges.

178. The Department states that an institution would "have a separate opportunity to respond to a claim during any recoupment proceeding," but the procedures it adopts for recoupment do not provide an effective opportunity to contest reliance, effect on borrowers, or amount of discharge. Schools are injured by the Department's skewed group-claim process because they bear the burden in the recoupment proceeding of proving that the borrower-defense determination is wrong, *see* 34 C.F.R. § 668.125(e), but have no meaningful ability to defend against the discharges decided in the group process in a recoupment proceeding.

**E.      The All-Or-Nothing Approach to Discharge Amounts Violates the HEA and is Arbitrary and Capricious.**

179.     Nothing in Section 455(h), which authorizes the Secretary to specify institutional acts or omissions, grants the Department the power to prescribe rules for assessing discharge amounts, which should be left to the appropriate tribunal.   Nevertheless, to the extent the Department is deemed to have both broad rulemaking authority over discharge amounts *and* adjudicatory authority over borrower defenses, the Department must make individualized determinations of the amount of discharge based on the harm or injury to the borrower caused by the conduct that prompted the loan obligation.  *See* 20 U.S.C. § 1087e(h).  The Final Rule does not satisfy that statutory requirement.

180.     The clear text of the statute indicates that the amount of the discharge must be based on the harm or injury to the individual borrower. A "defense to repayment" is a circumstance that excuses the repayment of a loan that was caused by an antecedent to the "act or omission" giving rise to the defense.  In other words, a borrower has a "defense to repayment" when the borrower cannot equitably be held responsible for repayment of all or part of the loan obligation. That, of course, depends on the borrower's actual, individualized harm or injury, that is, a determination that the borrower, as a result of the institution's act or omission, would not have incurred the loan, suffered harm from attending the institution or enrolling in a particular program, or did not receive the value of the promised education that the loan funded.  *Id.*  Disconnecting the amount of discharge from the amount of harm or injury to the borrower, the Department transforms the HEA into a massive windfall for borrowers.

181.     The Department's discharge rule abrogates section 455(h)'s causation requirement because it provides for the discharge of the borrower's loan obligations even if they *preceded* the

act or omission that gives rise to the defense. 20 U.S.C. § 1087e(h). If, for example, there is a misrepresentation concerning the provision of educational services to a student in her senior year, there is no reason to discharge the entirety of her debt from the prior three years.  There must be at a minimum an inquiry into what loans the student would not have taken out but for the school's act or omission.  But under the Department's binary approach, if a borrower defense is found, the Department will discharge "*all* amounts owed to the Secretary on a Direct Loan" and reimburse "*all* payments previously made to the Secretary on the Direct Loan."  34 C.F.R. § 685.401(a)(ii) (emphasis added).

182.    This rule will sometimes unfairly work to the disadvantage of the borrower, but more often to the disadvantage of the school.  If the act or omission occurs late in the student's course of studies, the Department might decide that the act does not cause her injury warranting the full relief of total discharge and total reimbursement.  That is unfair to a borrower deserving discharge of *some* obligations caused by the act.  Conversely, even in circumstances where only partial discharge is warranted, the Department may grant the full discharge and attempt to saddle the school with liability (especially if it invokes the presumptions applicable to group or closed-school claims).  Either way, the Department's binary all-or-nothing discharge rule is irreconcilable with the causation of injury requirement of Section 455(h).

183.    In addition, the Final Rule eliminates any intelligible principle for determining the amount of discharge. Courts are loathe to interpret statutes to have delegated unbridled discretion to agencies.  The Department cannot rescind loan obligations that are not causally related to the act in question.

184.    The Department's fiat that the only permissible remedy is full rescission of all loan obligations and full restitution of past repayments is also arbitrary and capricious.  Equity allows

restitution and rescission in carefully defined circumstances.  The Department has broadly defined as borrower defenses to encompass a broad array of acts and omissions that "relate[] to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided." 34 C.F.R. § 685.401(a).  The Department cannot declare such a broad range of borrower defenses and then declare that rescission or restitution of the student's entire loan obligation is the sole remedy.  This underscores that Congress meant, as Section 455(h) clearly provides, that the Department's writ is only to specify defenses to loan repayment, not supersede the law of remedies in judicial actions for enforcement of debt.

185.    The Department fails to provide reasoned explanation why the amount of discharge can never depend on the loss suffered by the borrower (*e.g.*, a loss determined by the comparison between the value of the education received and the loan obligation), as the agency had previously required.  *See, e.g.*, 81 Fed. Reg. 75,974 (2016 Rule) (emphasizing that the amount of relief turns on the "value of the education" that the borrower received notwithstanding a school's misconduct); 84 Fed. Reg. 49,834 (2019 Rule) (similar).

186.    Without much explanation, the Final Rule deviates from the Department's long-held position that the amount of discharge is tied to educational value.  The Department arbitrarily presumes a full, automatic discharge is appropriate absent rebuttal and removes the requirement that the borrower must prove individualized harm *even though* the Department in the July NPRM "recognize[d] that there may be circumstances in which the financial harm experienced by a borrower is less than the amount of a full loan discharge."  87 Fed. Reg. 41,908.

187.    The Department's position is not justified by the Department's proffered reasons.  First, the Department stated in its July NPRM that the individualized-harm requirement "could have the unintended consequence of providing lesser amounts of relief for a borrower who

succeeded despite their program." 87 Fed. Reg. 41,908.  That argument rests on the premise that the Department cannot assess harm to an individual borrower; indeed, the Department expresses concerns that assessing harm is a "subjective" or difficult enterprise.  *Id.* at 41,909; *see also* 87 Fed. Reg. 65,946.  In addition to being flatly inconsistent with the Department's 25 year-old position, *see, e.g.*, 84 Fed. Reg. 49,834, the Department offers no explanation as to why it—the primary Federal regulator of educational institutions—cannot assess the "value of educational services," especially when tribunals across the country routinely assess individualized harm in tort cases outside of their expertise.

188.    Second, the Department's Final Rule stated that an individualized-harm requirement is "an inappropriate barrier to relief for the borrower" because it "require[s] the borrower to have knowledge about regional and national employment opportunities." 87 Fed. Reg. 65,910.  "We believe that a borrower is unlikely to know how to locate regional or national unemployment rates and connect those data to their own experience." *Id.*  This argument only applies to one particular measure of harm; the Department never establishes why it cannot adopt other individualized measures of harm even if this concern were valid.  Furthermore, the Department does not explain why it believes borrowers are incapable of gathering evidence to prove harm.  Nor does it explain why its concern that harm is difficult to prove would justify simply presuming the existence of harm.

189.    Because, according to the Department, how much to award a borrower meriting only partial discharge would be "difficult to reliably estimate," 87 Fed. Reg. 65,946, the new rule is tantamount to an improper presumption of full discharge.  The proof of a borrower defense claim on the merits, on whatever basis, does not render a full discharge so probable that individual fact-

finding can be bypassed.  *Chemical Mfrs Ass'n*, 105 F.3d at 705.  That renders the Department's Final Rule unlawful.

> **F.**    **The Extension of BDR Regulations to Perkins and FFEL Loans Violates the Statute.**

190.    Section 455(h) authorizes borrower defenses to repayment under the Direct Loan Program only to a loan "made under this part," namely, Part D (the William D. Ford Federal Direct Loan Program).  20 U.S.C. § 1087e(h).  The Department acknowledges this limitation but applies the Final Rule to both FFEL and Perkins Loans that have been *or could be* consolidated with Direct Loans. Indeed, the Department states that the BDR application will itself serve as the application for consolidation, and that consolidation can occur *after* a borrower defense is granted.  *See* 34 C.F.R. § 685.401(a) ("Covered loan"); 87 Fed. Reg. 65,915–65,916.  This rule cannot be squared with Section 455(h).

191.    Congress chose to authorize a BDR only for Direct Loans because the government is the lender, and thus Congress has only authorized the Department to specify borrower defenses to repayment of the government's own lending contracts. FFEL and Perkins loans—which have not been issued since 2010 and 2017 respectively, 87 Fed. Reg. 65,906 n.3—stand on a different footing.  FFEL loans are agreements that the borrower executes with private lenders, for which the United States guaranteed repayment.  Federal Student Aid, Department of Education, *Federal Family Education Loan (FFEL) Program*, https://studentaid.gov/help-center/answers/article/ffel-program.  Perkins loans involve a lending contract with the school, which the United States subsidizes.  Financial Aid Programs, https://www.benefits.gov/benefit/418; Federal Student Aid, Department of Education, *Participating in the Perkins Loan Program*, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2021-2022/vol6/ch3-participating-perkins-loan-program.  Congress granted the Department no authority to specify borrower

defenses to repayment of loans to private or institutional lenders under the FFEL or Perkins programs.

192.     A Federal Direct Consolidation Loan ("FDCL") is a loan under Part D (the William D. Ford Federal Direct Loan Program), and thus the Department may specify as borrower defenses to repayment under Section 455(h) acts or omissions taken against a borrower who at the time holds or is applying for a FDCL.  *See* 20 U.S.C. § 1087e(a)(2)(C).  But the Department may not recognize a borrower defense based on acts or omissions against a student who at the time funded her education with FFEL or Perkins loans, not Direct Loans. That is beyond the authority delegated by Congress.

193.     Indeed, the Department's position leads to unfair and arbitrary treatment of similarly situated individuals.  Students who took out FFEL loans at the same time and are subject to the same acts or omissions receive relief if they have not paid them back, but none if they repaid them.  There is no rationale for treating similarly situated borrowers so radically differently, and indeed treating borrowers who have dutifully met their repayment obligations worse. This arbitrariness would have been avoided had the Department properly interpreted Section 455(h) to apply the defense only to borrowers who funded their education with Direct Loans.

194.     The Department justifies its consolidation rule because Congress has provided that Direct Loans should be made under the same "terms, conditions, and benefits" as FFEL Program loans.  87 Fed. Reg. 65,916 & n.47 (citing 20 U.S.C. §§ 1087a(b)(2), 1087e(a)(1)).  But BDR is not a term, condition, or benefit of a FFEL Program loan; it is a statutory provision specific to Direct Loans, and cannot be extended to FFEL and Perkins loans through consolidation.  The Department must comply with the statute as written, not as it wishes it was written.

195.    Furthermore, the statute contemplates only "a defense to *repayment* of a loan *made* under this part."  20 U.S.C. § 1087e(h) (emphasis added).  One cannot assert a defense unless the Direct Loan has already been "made," past tense; further, there is no such thing as "repayment" of a Direct Loan that has not yet been made. But under the Department's consolidation rule, the Department first adjudicates a borrower defense even when no Direct Loan has been made, and then consolidates other loans into a Direct Loan "only … if the claim is approved," "streamlin[ing] the claims process."  87 Fed. Reg. 65,916.  The statute does not permit the granting of borrower defenses to putative "repayment" of future Direct Loans that have not yet been "made." The Department's rule violates this provision of the statute.

196.    Finally, the Department's consolidation rule is at odds with its regulatory definition of a "borrower defense."  The definition provides that "*Borrower defense to repayment* means an act or omission of the school attended by the student that relates to *the making of a Direct Loan* for enrollment at the school or the provision of educational services for which *the loan* [*i.e.*, the Direct Loan] was provided . . . ."  34 C.F.R. § 685.401(a)(ii) ("Borrower defense to repayment)." That would exclude acts or omissions that relate to the making of an FFEL or Perkins loans, which are not Direct Loans. The Department did not cure the problem by declaring that BDR includes "repayment of amounts owed to the Secretary on a Direct Loan including a Direct Consolidation Loan that was used to repay" FFEL and Direct Loans.  *Id.*, subpart (i).  Under the regulation, there is still no defense if the act or omission did not relate to the making of a Direct Loan, or if no Direct Loan was provided to pay for educational services. The Department's regulations are an exercise in contradiction.

G. **The Final Rule's Establishment of a Reconsideration Process for Borrowers But Not For Schools Is Arbitrary and Capricious.**

197.    The Department's rule regarding reconsideration is arbitrary and capricious and violates the Constitution.  The Final Rule enshrines a one-sided process by which only borrowers and state requestors may seek reconsideration and in which State law matters may be adjudicated. 34 C.F.R. § 685.407. The former is discriminatory and arbitrary in violation of the APA and the latter violates due process and the Seventh Amendment.

198.    The one-sided nature of the Department's reconsideration regulation is discriminatory and arbitrary. Administrative agencies "must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play." *Morgan v. United States*, 304 U.S. 1 (1938).  Accordingly, due process instructs administrative agencies to provide both sides of a dispute with an opportunity to be heard.

199.    Here, only one side of a dispute—the borrower or the state requestor—has the opportunity to be heard by requesting reconsideration. The Department asserts that borrowers or state requestors may want to seek reconsideration due to administrative or technical errors and new evidence, but provides no reason to think that schools will not want to seek reconsideration on the same grounds. And it provides no reason to distinguish between schools and borrowers or state requestors in this regard, nor why duplicating judicial review for borrowers but not institutions is appropriate. Drawing such a distinction without a rationale is discriminatory, and thus arbitrary. It also is particularly harmful because schools are provided limited procedural rights in both discharge and recoupment proceedings.

H. **The Recoupment Procedures Violate the Statute, the APA, and the Constitution.**

200.    To justify massive loan forgiveness, the Department attempts to make it easier to recoup its losses from institutions, thereby shifting the risks of nonpayment of student loans from

borrowers and itself to institutions.  The Department provides that it may collect the liability for any borrower defense discharge from the school in a proceeding analogized to a "program review."  *See* 34 C.F.R. § 685.409; 87 Fed. Reg. 65,912.

201.    In that proceeding, the Department provides written notice to the school of the borrower-defense determination, the basis of liability, and the amount of the discharge.  34 C.F.R. § 668.125(a).  The institution must request review by a designated Department official.  *Id.* § 668.125(b).  If it does request review, a hearing will be held.  *Id.* § 668.125(c)-(d).  The Department only has "the burden of production to demonstrate that loans made to students to attend the institution were discharged on the basis of a borrower defense to repayment claim."  *Id.* § 668.125(e)(1).  By contrast, "[t]he institution has the burden of proof to demonstrate that the decision to discharge the loans was incorrect or inconsistent with law and that the institution is not liable for the loan amounts discharged or reimbursed.  *Id.* § 668.125(e)(2).

202.    The evidence allowed is extremely restricted.  The only evidence allowed is (1) any materials submitted to the Department in the BDR process by the borrowers, the institution, or third parties; (2) any materials that the Department relied on that it chooses to provide to the institution; and (3) any "documentary evidence" that the institution submits that relates to the bases of the borrower defense or recoupment claim.  *Id.* § 668.125(e)(3).

203.    The resulting rule far exceeds the Department's statutory authority, violates the Constitution, and contravenes the APA.  The flaws in the recoupment processes are more important than ever before because of the massive amount of liability the Department has now shifted onto institutions of higher education.

204.    The Department's recoupment procedures exceed its statutory authority: Congress has not granted the Department authority to recover discharged loans at all, and the Department

56

certainly does not have the authority to establish internal procedures that make it a judge in its own cause. Agencies may exercise only those authorities that Congress provides by statute. "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In particular, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.C. Cir. 2018).

205.    Here, Section 455 of the HEA does not provide the Department with the authority to recover the amount of loans discharged by way of borrower defense. *See* 20 U.S.C. § 1087e(h). That stands in stark contrast to other parts of the HEA, which do provide such authority. *See, e.g.*, 20 U.S.C. § 1087(c)(1) (in cases of closed schools, false certification, and lender refunds, "the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H"). Indeed, the Department appears to have admitted as much. *See* 81 Fed. Reg. 75,929.

206.    The Department points to Section 454(a)(3) of the HEA, 20 U.S.C. § 1087d(a)(3), as authority for its recoupment procedures. *See* 87 Fed. Reg. 41,911, 65,948. But that provision states merely that a Program Participation Agreement must "provide that the institution accepts responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement." 20 U.S.C. § 1087d(a)(3). The provision notably does not by itself connect an institution's "responsibility and financial liability" to the Department's discharge of loans related

to borrower defense and it would be odd to infer it did so in light of specific statutory grant of such authority elsewhere in the HEA.  Furthermore, that provision does not authorize the Department to prescribe procedures for the adjudication of recoupment claims or to adjudicate an institution's liability in a given case.

207.    Congress must expressly authorize an agency to adjudicate public rights.  Further, the Supreme Court has instructed in *West Virginia v. EPA*, and other cases, that agencies only enjoy those powers provided them by Congress and, when major questions are involved, a "clear congressional authorization" is required.  *West Virginia*, 142 S.Ct. at 2614 (internal quotation marks omitted).  The Department cannot place the burden on the private party to disprove the agency's authority, rather than on the agency to justify its authority. In addition, Congress' provision of specific authority indicates that it did not intend to provide other authority.

208.    To the extent administrative adjudication is permitted, the Department's creation of bifurcated group and individual borrower claim processes in 34 C.F.R. §§ 685.402, 685.403, and 685.406—in which the school has no right of discovery or ability to examine either the borrower or a third-party witness, and is limited to providing an institutional response pursuant to 34 C.F.R. § 685.405—is arbitrary and capricious and in violation of the school's due process rights.

209.    In addition to exceeding the Department's statutory authority, the Department's Final Rule violates a host of constitutional protections.

210.    The recoupment procedures do not ensure adjudication by a neutral decision-maker, in violation of due process.  It is a fundamental principle of due process (and also consequently the APA) that the adjudicator of a claim must be unbiased.  Here, the Department

stands to gain financially from deciding to recoup discharged loan amounts from schools because it is able to shift its risk of the nonpayment of student loans from itself to institutions.

211.    It is particularly problematic that the Department has arrogated to itself the power to adjudicate its own liability for such a large amount of money, billions of dollars, without clear congressional authorization.

212.    The Final Rule's established procedures violate Article III and the Seventh Amendment. The Seventh Amendment protects the right to trial by jury for actions that arise "at common law."  U.S. Const. amend. VII; *Tull v. United States*, 481 U.S. 412, 417 (1987).  Under both Article III and the Seventh Amendment, Congress may assign an action to administrative adjudication only when it involves "public rights."  *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977).  Here, a recoupment action arises "at common law" and does not involve "public rights."

213.    The right that the Department seeks to vindicate in a recoupment action arises at common law. The Department admitted as much in 2016, conceding that recoupment was a "common law claim."  81 Fed. Reg. 75,929.

214.    In addition, any administrative recoupment proceeding that is based on a borrower defense that turns on a violation of State law or breach of contract involves the common law under any plausible reading of Supreme Court precedent. This right is not a public right that can be committed to administrative adjudication. A right may be committed to administrative adjudication when it is a "new action" and jury trials would "dismantle the statutory scheme" and "impede swift resolution" of the agency's prosecutions.  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *see Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 455 (5th Cir. 2022).

215.    The Department's new procedures also do not satisfy procedural due process protections. The Constitution guarantees due process in administrative adjudications that will deprive an entity of a property interest. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976).

216.    At common law, the Secretary would have the burden to prove indemnification in court; it is fundamentally unfair and unwarranted for the Final Rule to shift the burden to the school to *disprove* the propriety of the borrower defense determination, especially when the Department has controlled the underlying borrower defense proceeding.

217.    Furthermore, there are no mechanisms for the school to discover critical evidence from either third parties or the borrower or to test the credibility of the borrower.  Although the school may sometimes have internal evidence regarding its own acts or omissions, the occurrence or nature of an act or omission may often be disputed.  For example, if the institution disputes the claim that aggressive or deceptive recruitment occurred, it has no mechanism to discover the borrower's evidence, to test borrower's testimony in a prior proceeding, or to compel the testimony of the borrower or necessary third parties.   Typically, only the borrower will possess certain critical evidence, including whether he or she received or relied on a misrepresentation, whether he or she suffered detriment due to an alleged act or omission, or the extent of that detriment.  The school has no means—and the Final Rule provides none—to discover or adduce such critical evidence.  Even worse, when the Department adjudicates group claims or closed-school claims, those key facts will simply be presumed.  Yet the Final Rule places the burden of proof on the school, which cannot gather and produce evidence essential to refuting liability.

218.    The obvious and most efficient alternative, if administrative adjudication is to be permitted at all, would be a single adversarial hearing before an administrative law judge where the borrower (the claimant) bears the burden of the proof.  Both parties would have access to the

limited discovery needed for the generally straightforward issues of whether and what act or omission occurred and whether it caused the borrower injury justifying the extraordinary relief of discharge. Further, such an adjudication process would present the opportunity to submit and pressure test evidence at trial. That is the standard fare for formal administrative adjudication, and there is no reason such hearings could not be held in these cases where large sums are at stake.

219.    Alternatively, even if the Department deemed it necessary to bifurcate the two proceedings, it could still provide for a recoupment hearing with discovery and witness examination, with the Government bearing the burden of proof. The Department previously provided for formal adjudication of all recoupment actions in evidentiary hearings (including a unified borrower defense/recoupment adjudicatory proceeding at the hearing official's discretion). *See* 37 C.F.R. § 668.87 (2022). The Department has not provided a reasoned explanation as to why bifurcated proceedings without administrative trials are more efficient mechanisms for arriving at the correct and just conclusion. The only possible (illegitimate) reason for the Department's particular bifurcated proceedings is to maximize borrower relief and deny schools a fair opportunity to contest liability, thus ensuring that the financial burden of discharge falls on the school and not the Department.

220.    Due process is especially important given that the recoupment procedures implicate such significant private interests. A borrower defense results in a complete discharge of a borrower's loan obligations and reimbursement of amounts paid (either voluntarily or though enforced collection), so recoupment of any individual borrower defense can involve tens or hundreds of thousands of dollars. A group claim can potentially involve many millions of dollars.

221.    In light of the interests at stake, additional safeguards—indeed, safeguards that are ingrained in American law—are necessary for the just resolution of recoupment disputes. Such

basic procedures such as discovery and witness hearings are the only means by which a school can develop evidence on (and thus meaningfully contest) numerous important issues, including reliance, injury, and whether the injury justifies the full relief awarded. Without these procedures, the risks of error and erroneous discharges are high.

222.    Yet the government's interest in not providing these procedural safeguards is very low. Indeed, the Department has not yet offered any reason why it cannot provide these safeguards, which are typical even in agency adjudicatory proceedings. The lack of explanation forecloses any meaningful opportunity for the public to comment. One conceivable objection to discovery could be the potential for delay, but the Department acknowledges and accepts that the "rights of institutions . . . can take months if not years to fully exhaust." *See, e.g.*, 87 Fed. Reg. 41,912.

223.    The Department's recoupment procedure also violates the APA because it lacks a reasoned basis.

224.    The Final Rule makes clear that it is the expectation, indeed designed intent, of the Department for the recoupment process to have the punitive and "deterrent effect" against educational institutions. 87 Fed Reg. 65,908 ("These regulations should have a deterrent effect dissuading institutions from engaging in conduct that would give rise to a defense to repayment.").

225.    In the July NPRM, the Department argued that the purpose is to separate borrower defense application reviews from recoupment proceedings. 87 Fed. Reg. 41,912. But those two proceedings were already separate under the 2019 regulations (if not the 2016 regulations) and the Department has failed to explain why the separated procedures that already existed under the 2019 regulations are insufficient. *Compare* 34 C.F.R. § 685.206(e)(1)-(15) (discussing how borrower defense claim is adjudicated), *with* 34 C.F.R. § 685.206(e)(16) (setting forth how Department may

recover after "borrower's successful borrower defense to repayment" through 34 C.F.R. § 668.87, that is subpart G of part 668). The Department's rationale appears to misunderstand the current regulation and thus violates the APA.

226.    The Department also incorrectly claimed that institutions would prefer the program review process in part H because it is more "familiar." 87 Fed. Reg. 41,912. But—even if schools would sacrifice procedural fairness for "familiarity"—the Department's recoupment procedures as they *currently exist* under the 2019 regulations are also based on part G, and certainly familiar to institutions. The difference between part G, which the 2019 recoupment process relied on, and part H, which the Department has now adopted, is that part H provides fewer procedural protections (part G hearings, while not perfect, do allow institutions to put on witnesses, submit expert testimony, and engage in motions practice). Schools are equally familiar with both longstanding parts of their governing regulations, and the Department's reasoning for the changes does not pass muster.

227.    The Department fails to credit concerns that bifurcated proceedings will subject schools to substantial reputational harms before (and notwithstanding) the final adjudication of borrower defense claims. To the extent that a school has any meaningful procedural rights, it cannot exercise them until a recoupment proceeding, which necessarily occurs after a successful application. In the meantime, the institution will lose community support; its reputation will be tarnished in the eyes of accreditors, state authorization agencies, and employers; alumni will lose opportunities; and prospective students will be discouraged from applying and enrolling. Separating application review and recoupment only serves to exacerbate these incalculable reputational harms while a school waits for the opportunity to defend itself.

## I.   The BDR Constitutes Impermissible Retroactive Rulemaking.

228.     It is a bedrock principle that an agency cannot engage in retroactive rulemaking without congressional authorization. *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988).  A rule is retroactive if, among other things, it operates to "create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (brackets and internal quotation marks omitted). A rule is thus retroactive if "the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994).

229.     The Department recognizes this limitation, 87 Fed. Reg. 65,915, but failed to honor it.  The Department has forsworn collecting any liability from schools if the applicable standard became effective after the first disbursement of the loan.  34 C.F.R. § 685.409(b).  But retroactivity depends on when the act or omission of the school occurred, not when the loan was disbursed. The disbursement of a loan is not the institutional conduct being penalized under the new BDR standard; it is the act or the omission of the school. A school is entitled to notice of the legal standard so that it can conform its conduct to that standard, and thus "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place."  *Landgraf*, 511 U.S. at 265.  Thus, at a minimum, the legal standards set by the 1994, 2016, 2019, and 2023 rules cannot apply to any act or omission of an institution occurring before the effective date of those regulations, even if the disbursement date occurs after the effective date of the applicable standard.

230.     The impermissible retroactivity is most glaring with regarded to consolidated FFEL and Perkins Loans.  The Department treats as the applicable disbursement date the date on which the consolidated loan is disbursed, rather than the disbursement date of the original Direct, FFEL,

or Perkins loan.[3] The FFEL and Perkins programs were discontinued in 2010 and 2017 respectively; any act or omission that might conceivably give rise to a borrower defense in relation to those loans necessarily happened before those times. But those acts or omissions cannot be governed by the new harsher legal standard simply because the consolidation loan (which may now be executed *after* the borrower defense is approved) is deemed disbursed after 2023. The applicability of the various legal standards in the 1994, 2016, 2019, and 2023 rules should at a minimum turn on whether the effective date of the regulation occurs before the act or omission, and should not turn on the loan disbursement date.

231.    Independently, the rule violates the prohibition against retroactive rulemaking because it declares illegal conduct that predates the new rule, with severe consequences. The Department's attempt—unique to this borrower defense rulemaking—to avoid triggering the rule against retroactive rulemaking by asserting that it is decoupling the approval of a borrower defense claim and the adjudication of recoupment against an institution, 87 Fed. Reg. 65,915, does not save it from the rule against retroactive rulemaking.  The Department's promise that it will not attempt recoupment for acts or omissions that are only now deemed illegal does not change that the rule retroactively renders them unlawful, which has legal consequences for the borrower and for the school apart from whether recoupment occurs.

232.    Moreover, the rule is retroactive because application of the new BDR standard to find violations based on past conduct will have collateral consequences for accreditation and state approvals and will cause negative harms to reputation.

---

[3] 87 Fed. Reg. 41,887 ("[T]he Department treats the date of the consolidation loan as the one used to determine what regulation their claim should be adjudicated under").

**J.      The Final Rule Relies on an Incomplete and Flawed Cost/Benefit Analysis.**

233.     The Department's cost/benefit analysis is flawed and rests on implausible assumptions, is incomplete and incapable of proper evaluation, and demonstrates the arbitrariness and capriciousness of the Department's regulations.

234.     As an initial matter, even the Department's (unduly low) estimates of costs are staggering. The Department estimates (as its "primary" estimate) that the borrower defense changes alone in its proposal will cost $17 billion retroactively and $2.7 billion over the next 10 years. 87 Fed. Reg. 41,961. That is a tremendous number and reinforces the argument that courts should require clear congressional authorization for such a major policy decision.

235.     The Department's estimates are flawed and rest on several implausible assumptions that understate the potential costs of the Department's rule. First, the Department provides no explanation for its estimate that only 12% of individual claims will be approved, while 75% of group claims will be approved. 87 Fed. Reg. 41,959 (Table 5). This is especially troubling when the overall estimate for approval of claims in the 2016 regulations was 65%. *See* 87 Fed. Reg. 41,833. Raising the estimate for individual claims would increase the costs.

236.     Second, the Department is underestimating the amount of loan volume subject to BDR. It predicts that the loan volume of proprietary schools subject to BDR claims will actually decrease as time passes, notwithstanding the loosening of the standard and the corresponding strengthened incentives to file a borrower defense claim with loosened standards, and the lack of a similar prediction for non-profit institutions. *See* 87 Fed. Reg. 66,010 (Table 7, predicting decline in loan volume for proprietary institutions).

237.     Third, the Department underestimates its recovery percentages, thereby underestimating the harm to institutions. The Department's estimates that it will recover only 15% of discharged loans from proprietary institutions and 12% from non-profit institutions seem low

in light of the fact that the recoupment procedures do not allow the institution much opportunity at all to defend itself.  87 Fed. Reg. 66.012 (Table 7).  This assumption is particularly incongruous with the Department's earlier estimate of recovering 20% from proprietary and private institutions and 75% from public institutions under the 2019 regulations and 37% from proprietary and private institutions and 75% from public institutions under the 2016 regulations.  *See* 87 Fed. Reg. 66,013 (Table 8).  The Department utterly fails to explain why these estimates differ so greatly.

238.    Indeed, the Department's tabular assumptions as a whole lack adequate explanation.  The Department hardly explained how it arrived at its estimates other than a fleeting reference to the President's Budget.  For example, the Department acknowledged that it "has only begun one recovery action related to approved BDR claims, and it has yet to conclude." 87 Fed. Reg. 66,015; *see also* 87 Fed. Reg. 65,990 ("To date, the Department has yet to complete a recoupment effort . . . .").  Without data, the Department lacked a rational method to predict the likelihood of recovery.

239.    In addition, the Department's cost/benefit analysis was incomplete and incapable of proper evaluation as required by the APA.  Although the Department had already proposed a settlement agreement in *Sweet v. Cardona*, the Final Rule "did not incorporate the effects of the proposed settlement." 87 Fed. Reg. 65,990.  The settlement agreement has now received approval and will almost certainly result in the grant of complete loan discharges to hundreds of thousands of borrowers.  The Department could not have properly evaluated its proposal from a cost/benefit perspective without accounting for the massive settlement.  Even if the settlement were ultimately not approved, the Department's assumptions were inaccurate because the mere announcement of the settlement spurred a tremendous number of filings.  Since the settlement agreement's execution date but before its final approval, approximately 250,000 applications were submitted by

borrowers who attended approximately 4,000 schools.  *See Sweet v. Cardona*, No. C 19-03674 WHA, 2022 WL 16966513, Dkt. No. 380 (N.D. Cal.).

240.    Further, the Department's cost/benefit analysis demonstrates the arbitrariness and capriciousness of the new regulations. The Department states that for the 2019 regulations, it had estimated that 7.5% of claims were approved and for the 2016 regulations, 65% of claims were approved.  87 Fed. Reg. 65,991.  The July NPRM drew the inaccurate inference from those bare statistics that the 2019 regulations led to "denials for too many claims."  87 Fed. Reg. 41,883.  At a minimum, it is entirely arbitrary to conclude that a 7.5% approval rate is too low absent an analysis of the error rate for the Department. That is especially true because the 7.5% statistic is simply an estimate, for the Department did not adjudicate any claims under the 2019 regulations. The Department's analysis demonstrates that its rule is not designed to approve legitimate borrower defense claims, but rather to increase the approval of borrower defense claims regardless of their legitimacy to some pre-conceived and arbitrary rate.  That is not reasoned decision-making.

### III.    The Department's Prohibition on Pre-Dispute Arbitration Agreements and Class Action Waivers Contravenes the Federal Arbitration Act, the Spending Clause, the Due Process Clause, and the APA.

241.    Relying solely on the HEA § 454's vague permission to condition funding on "such other provisions as the Secretary determines are necessary," 20 U.S.C. § 1087d(a)(6), the Department's Final Rule bluntly bans advance agreements between schools and students to arbitrate.  34 C.F.R. § 685.300(e).

242.    By forbidding reliance on arbitration agreements, the Final Rule renders them invalid and unenforceable—an out-and-out nullification of the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*.

243.    The Department insists that its arbitration ban would neither "displace or diminish the effect of the FAA" nor "invalidate any arbitration agreement," 87 Fed. Reg. 65,956, but instead "simply condition the institution's future participation in the Direct Loan Program on the institution not enforcing of certain [arbitration or class action] provisions in those contracts going forward," 87 Fed. Reg. 41,917.  In the Department's strained view, the Final Rule does not render any arbitration agreement unenforceable; it only threatens to withhold funding critical to the existence of any school that enforces an arbitration agreement.

244.    Even accepting the Department's euphemism—that the Final Rule is a "simple condition" and not a ban—the FAA preempts *any* discrimination against arbitration not authorized by Congress.  *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).  Under prevailing Supreme Court precedent, there is no difference between an outright prohibition on arbitrating a certain type of claim and a "rule that covertly accomplishes the same objective." *Id.*  However described, the Department's rule is unlawful because it "fails to put arbitration agreements on an equal plane with other contracts." *Id.* at 1426–27.

245.    In addition, the Department's reliance on its vague power to place conditions for Federal funding as authority for this regulation violates the Spending Clause because in the absence of unambiguous congressional intent, it wrongly coerces schools to agree to a condition not related to the purpose of Federal funding.  The Department never addressed this constitutional issue in its Final Rule.

246.    The Department asserts that this regulation serves the purposes of the Direct Loan Program because arbitration agreements "discourage borrowers from pursuing complaints," prevent borrowers from "hav[ing] their day in court," and "insulate[] institutions from the potential financial risk."  87 Fed. Reg. 65,980.  These terse arguments, which would justify a ban on

arbitration agreements and class-action waivers in any contract related to federal funding, are vague and generic; they provide no rationale for banning arbitration of disputes related to the provision of education services.

247. Moreover, the Department's assertion of relatedness is also fundamentally inconsistent with the borrower defense statute, which provides for borrower "defenses" in collection proceedings, not the massive scheme the Department has enacted to produce mass loan forgiveness. In any event, the Department has not explained why a provision that restricts student choice in education is related to a program whose purpose is increasing student choice in education.

248. Apart from the plain contravention of the FAA and the Spending Clause, the Final Rule is arbitrary and capricious for failing to weigh the benefits of arbitration in any meaningful way. In 2019, the Department's "extensive review" suggested that arbitration of BDR-related claims made sense for borrowers in light of "the burdens attending litigation." 84 Fed. Reg. 49,843. In comparison to the courts, the Department said, "arbitration adjudicates claims relatively quickly, cheaply, and, concurrently, gives the 'customers' what they want." *Id.* More specifically, arbitration is "more accessible to borrowers since it does not require legal counsel and can be carried out more quickly than a legal process that may drag on for years." 83 Fed. Reg. 37,265. Quicker adjudication of borrower defense claims benefits not only the individual claimant, but also future students. Arbitration is preferable because: (a) it enables "an institution to more quickly identify and stop bad practices to ensure that other students are not harmed" and (b) "it may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees." *Id.*

249. The Final Rule failed to consider these benefits, which directly address the Department's stated concern that arbitration agreements "undermin[e] borrowers' rights to avail

70

themselves of certain loan discharges, depriving borrowers of the protections in the HEA."  87 Fed. Reg. 65,980.  Unfortunately, it is all too often the case that the overburdened Federal court system stymies effective resolution, which would undermine borrowers' rights under the HEA. Likewise, class actions in the Federal court system can be lucrative for plaintiffs' lawyers, yet provide slow and paltry relief for class members.  In contrast, the American Arbitration Association's Consumer Rules, utilized by hundreds if not thousands of educational institutions, are designed first and foremost to "achieve a fair, efficient, and economical resolution."  *See, e.g.*, AAA Consumer Arbitration Rules (effective Sept. 1, 2014) R-22, R-23, R-51.

250.    The Department never engages in a real comparison between arbitration and litigation on these points, acknowledging in passing that "arbitration lowers the costs" but ignoring the myriad other benefits.  87 Fed. Reg. 65,980.  *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem.");  *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003).  The Department abandoned its unexplained and unsupported argument in the July NPRM that arbitration somehow "impede[s] borrowers' ability to file borrower defense claims and receive appropriate relief."  87 Fed. Reg. 41,914.  In the Final Rule, the Department elliptically asserts that arbitration agreements "effectively discourage borrowers from pursuing complaints."  87 Fed. Reg. 65,980.  Rather than review any literature on the accessibility, efficacy, and fairness of arbitration, the Department just threw up its hands; the July NPRM excused the Department's failure to consider these benefits on the unpersuasive ground that "no study . . . has addressed arbitration in the context of higher education and student loans."  87 Fed. Reg. 41,915.

251.     The most concrete evidence marshaled against arbitration agreements was the July NPRM's vague citation to "the Department's experience with Corinthian Colleges." *Id.* Even if this sort of tunnel vision were a permissible mode of agency decision-making, the agency's reasoning ultimately relied on a counterfactual—*not its experience*—that Corinthian would have possibly faced "significant deterrent threat" if not for its arbitration provisions. *Id.* The agency cannot (of course) prove its counterfactual history, which also glosses over a host of reasons for the failure of Corinthian Colleges that had nothing to do with pre-dispute arbitration clauses.

## IV.     The Closed School Discharge Provisions Violate the Statute and Due Process.

252.     The Department's expansion of the definition of a "closed school" is contrary to the statute.  In the preamble, the Department refers to closed school discharge as something borrowers are "legally entitled to in the HEA," 87 Fed. Reg. 65,906, and declares that the Final Rule changes "streamline and strengthen the closed school discharge process" for students whose schools closed while the students were attending an institution or shortly after the students left the institution, 87 Fed. Reg. 65,969.  But the Final Rule goes well beyond the HEA, including in its highly expanded and discretionary definition of what constitutes a "closed school."

253.     The Final Rule affords the Secretary discretion to determine that a school's closure date is the earlier of the date that the school ceased to provide instruction in "most" programs, "as determined by the Secretary," or "a date chosen by the Secretary that reflects when the school had ceased to provide educational instruction for most of its students."  87 Fed. Reg. 65,966.[4]

---

[4] The Department has stated that it will provide additional guidance as to what constitutes a closed school in Volume 2 of the Federal Student Aid Handbook, *see* 87 Fed. Reg. 41,923, 41,924.  To the extent this forthcoming guidance includes triggering events that are inconsistent with the statute, it is objectionable and unlawful.

254.    The HEA, however, does not suggest that a school closure is—or should be— defined as a scenario where "most" programs have ceased or "most" students have ceased to receive educational instruction.  Rather, the HEA describes the discharge as applying where:

> [A] borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled *due to the <u>closure</u> of the institution.*

20 USC § 1087(c)(1) (emphasis added).

255.    "Closed" is an unambiguous term that plainly means "not open." *See, e.g., Closed*, Merriam-Webster   Dictionary,   https://www.merriam-webster.com/dictionary/closed;   *Closed*, Cambridge   Dictionary,   https://dictionary.cambridge.org/us/dictionary/english/closed.   The Department's attempt to rewrite the term "closed," and to give the Secretary *additional* discretion to interpret the Department's rewritten definition, contradicts the U.S. Supreme Court's instruction that: "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."  *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325 (2014).

256.    Further, utilizing a new definition of "closed" to provide discharges for "mostly closures" that may have occurred in the indefinite past (because there is no limitations period, which itself is unfair and prejudicial, *see supra* Section III), is improperly retroactive. The Department's closed school discharge rule cannot apply to any act or omission of an institution occurring before the effective date of those regulations.

257.    The Department's definition also affects the practical operation of schools in an ever-changing economic environment.  Institutions evaluate the labor market and make decisions to add or discontinue program offerings or school facilities in response to market demand and student needs. The Department's vague definition of what constitutes a closure risks penalizing schools that adjust their programming to reflect market shifts, and could be particularly damaging

to small institutions that wish to make changes to their portfolio of programs.[5]  Instead of starting new programs and discontinuing old programs, some colleges may keep old programs afloat simply to avoid school loan liability.

258.    Similarly, institutions may wish to cease operations at certain facilities while continuing to operate at others, a common scenario the Final Rule treats no differently than an institution that completely shuts down.  In tandem with the Department's highly discretionary and arbitrary process for determining when a school has "closed," the definition introduces considerable financial risk to what should be an efficient and flexible use of facilities to meet program demands as they ebb and flow.  An institution may desire to close a facility and reallocate its resources for the overall health of the institution, its faculty, and its students.  But under the Final Rule, such a decision could be extremely costly and even pose an existential threat.  The Department arbitrarily failed to consider these effects on the students of an institution that remains "open" in the conventional sense of the word.

259.    The Department has unlawfully expanded the categories of borrowers who may be entitled to closed school discharge and relieved many borrowers of the requirement to apply for relief.  The Final Rule allows borrowers who withdrew from the school not more than 180 days before closure to receive a full discharge.  On its face, the Final Rule is at odds with the statute, which states that closed school discharges are available only to those students who are "unable to complete the program in which such student is enrolled."  20 U.S.C. § 1087(c)(1).  Further, the

---

[5] Although the Department contended in the July NPRM that "[t]his provision would not automatically apply if, for example, a small institution remains open but ends a program or two but would capture a circumstance where an institution continues only one small program while otherwise ceasing all other enrollment," 87 Fed. Reg. 41,923, given the Secretary's discretion to interpret what constitutes the termination of "most" programming, the risk to small institutions remains substantial.

Final Rule makes no distinction between borrowers who may have left their schools due to circumstances unrelated to the educational programming, *e.g.*, illness, locational preference, change in family situation, job change. Thus, the Final Rule arbitrarily allows discharges even where there is no causal connection between a student's decision to withdraw from school and a school's closure.

260.    The Department stated in its July NPRM that it would seek to recover funds "especially" for "closed school discharges" 87 Fed. Reg. 41,881. Yet, the Final Rule fails to provide any procedural protections for institutions (or their affiliates or principals), 20 U.S.C. § 1087(c)(1), to allow them to present evidence to defend against an application or recoupment. This is unfair and a violation of the due process rights, particularly where the Secretary is empowered to pursue "closed" school discharges against schools that remain open. And for schools that are closed, the taxpayers likely will bear much of the burden of funding the discharge amounts.

261.    The Department also lacks statutory authority to impose closed school BDR liability against affiliated persons. The Final Rule, "in the case of a closed school," allows the Department to pursue BDR recovery for loans disbursed on or after July 1, 2023, from "a person affiliated with the school." 34 C.F.R. § 685.409(a). The term "affiliated person" is described elsewhere in Department regulations and generally hinges on the level of ownership or control a person or entity exercises over the institution (which includes directors and executive officers). *See, e.g.*, 20 U.S.C. §§ 1001, 1002 (limiting the definition of "institutions of higher education" to the institutions themselves); *id.* §§ 1087(c)(1), 1099(c),(e) (differentiating controlling and affiliated persons). Congress has authorized limited recourse against principals and affiliates of a closed school. In Section 437 of Part B, governing FFEL, Congress has provided,

> If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled due to the closure of the institution or if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft, or if the institution failed to make a refund of loan proceeds which the institution owed to such student's lender, then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H. In the case of a discharge based upon a failure to refund, the amount of the discharge shall not exceed that portion of the loan which should have been refunded. The Secretary shall report to the authorizing committees annually as to the dollar amount of loan discharges attributable to failures to make refunds.

20 U.S.C. § 1087(c)(1).  If the borrower's loan is discharged pursuant to Section 437(c)(1), the borrower "shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals." *Id.* § 1087(c)(2).

262.    There is no comparable authority under Part D, the William D. Ford Federal Direct Loan Program. Nonetheless, the Department claims the authority to recover approved BDR discharges from, "in the case of a closed school, a person affiliated with the school as described in § 668.174(b) of this chapter." 34 C.F.R. § 685.409(a)(1).  Section 668.174(b) describes affiliated persons as those who individually or with family members exercise substantial control or ownership of the institution, or have liability for violation of a Title IV, HEA requirement, including directors, executive officers, and general partners.  34 C.F.R. § 668.174(b).

263.    The Department cannot create BDR liability for controlling or affiliated persons without statutory authority.  No such authority can be derived, directly or indirectly, from Section 437(c)(1).  Section 437(c)(1) is limited by its terms and does not permit attribution of BDR liability for Direct Loans to controlling persons.  It only applies to FFEL loans made under Part B, not Direct Loans under Part D. It authorizes discharges (and recovery against an institution and its

affiliates and principals) only in one of three circumstances: (1) inability to complete the program; (2) false certification by the eligible institution; or (3) false certification because of identity theft. 20 U.S.C. § 1087(c)(1).  And it allows the Secretary to recover any discharge amount by one of two mechanisms. The Secretary "shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals," which means that the *borrower* must have a claim of legal liability that can be asserted against those persons (and which Section 437(c)(2) has assigned to the Secretary by operation of law).  *Id.* § 1087(c)(1),(2).  Or the Secretary may "settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H," *id.* § 1087(c)(1), under which the Secretary may require for specific institutions sufficient cash reserves, third-party guarantees, financial guarantees from controlling persons, or the assumption of personal liability by controlling persons.  *Id.* § 1099c(c), (e).

264.    The Department rationalizes its expansion of liability to individuals on the ground that it would "protect taxpayers as much as possible," 87 Fed. Reg. 65,948, but that does not provide a statutory basis.  Moreover, to the extent the Department's reading of the statute imputes the acts or liabilities of certain individuals to the institutions, or vice versa, those matters should be covered by traditional principles of agency and derivative liability.

265.    The Department's only discussion of its extension of closed-school discharge provisions to Direct Loans is the summary statement in its July NPRM that "[t]he closed school discharge provisions also apply to Direct Loans, under the parallel terms, conditions, and benefits provision in Section 455(a) of the HEA."  87 Fed. Reg. 41,920; 20 U.S.C. § 1087e(a)(1) ("Unless otherwise specified in this part, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed on June 30, 2010, under Sections 1078, 1078–2, 1078–3, and 1078–8 of this title.").

But the Secretary's rights to recover BDR losses against institutions and affiliated persons are not the "terms, conditions, and benefits" of FFEL "loans made to borrowers." *See id.*

266.    Recovery under the BDR (which is a defense against a Secretary's claim to enforce repayment obligations of a Direct Loan) does not involve a legal "claim *available to such borrower against* the institution and its affiliates and principals." 20 U.S.C. § 1087(c)(1) (emphasis added). A borrower cannot bring a BDR "claim" against an institution or its affiliates and principals. And the alternative enforcement mechanism authorized by Section 437(c)(1) under the financial responsibility regulations would apply to affiliates and principals only of specific schools where such persons have made financial guarantees or assumptions of institutional liabilities pursuant to 20 U.S.C. § 1099c(c), (e). There is no basis for the Department's universal claim that it can seek to recoup institutional BDR liability from any affiliated person who meets the definition in 34 C.F.R. § 668.174(b),(c).

## COUNT ONE
### (BDR Regulations: No Statutory Authority)

267.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

268.    The Final Rule's provisions regarding borrower defenses to repayment are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

269.    Those provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, General Education Provisions Act, the Department of Education Organization Act, or any other identifiable statutory source of authority Congress has conferred upon the Department. The regulations impermissibly turn a statutory defense into a novel cause of action with a novel adjudicatory process in contravention of the plain meaning of the HEA.

270.    Specific BDR regulations set forth in the Final Rule—34 C.F.R. §§ 668.75, 668.125, 668.500-501, 685.300(13), and 685.401-409—violate or are unauthorized by statute.

271.    Retroactive application of the Final Rule and the regulations identified above is unauthorized by statute.

272.    Consequently, the Final Rule's provisions concerning borrower defenses to repayment  in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TWO
### (BDR Regulations: Arbitrary & Capricious)

273.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

274.    The Department failed to consider the thousands of public comments submitted in response to the July NPRM prior to hastily promulgating the Final Rule.

275.    The Final Rule's provisions regarding borrower defenses to repayment, and specific regulations therein—34 C.F.R. §§ 668.71-75, 668.125, 668.500-501, 685.300(13), and 685.401-409—lack sufficient reasonable basis, reasoned explanation, and consideration of appropriate factors, and do not serve the purposes of the Act.

276.     Consequently, the Final Rule's provisions concerning borrower defenses to repayment are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT THREE
### (BDR Regulations: Constitutional Violations)

277.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

278.    The Final Rule's provisions regarding borrower defenses to repayment, and specifically the regulations described in 34 C.F.R. § 668.125, 668.300(13), and 685.401-409, violate the Due Process Clause of the U.S. Constitution.

279.    By providing for administrative adjudication of private rights, or of public rights without congressional authorization, the Final Rule and its component regulations violate Article III of the U.S. Constitution and constitutional principles of the separation of powers.

280.    By providing for administrative adjudication of federal and state rights to which a right of jury trial exists, including misrepresentation, contract, and recoupment claims, the Final Rule and its component regulations violate the Seventh Amendment to the U.S. Constitution.

281.    By providing for administrative adjudication of any state law claim, and abrogating requirements or limitations under state law, the Final Rule and its component regulations violate the Tenth Amendment and constitutional principles of federalism.

282.    Consequently, the Final Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT FOUR
### (Arbitration and Class Action Provisions: No Statutory Authority)

283.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

284.    The Final Rule's provisions concerning arbitration and class-action contracts between schools and students are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

285.    These provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA.  Among other things, the regulations are not tied to any

specific grant of authority conferred by the HEA, they conflict with the Federal Arbitration Act, and were not otherwise authorized by Congress.

286.    Consequently, the Final Rule's provisions concerning arbitration and class-action agreements are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT FIVE
### (Arbitration and Class Action Provisions: Arbitrary & Capricious)

287.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

288.    The Final Rule's provisions concerning arbitration and class-action contracts between schools and students are arbitrary and capricious.  Among other things, the regulations fail to confront or acknowledge the benefits of individual arbitration to schools and students and fail to consider industry reliance on the terms of private contracts.

289.    Consequently, the Final Rule's provisions concerning arbitration and class-action agreements are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT SIX
### (Arbitration and Class Action Provisions: Constitutional Violation)

290.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

291.    The Final Rule's provisions concerning arbitration and class-action contracts between schools and students violate the Spending Clause of the U.S. Constitution.  Among other things, the regulations wrongly coerce recipients of Title IV funding to agree to a condition not related to the purpose of such funding and not intended by Congress.  *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012).

292.     The Final Rule's provisions concerning arbitration and class-action contracts between schools and students violate the Due Process Clause of the U.S. Constitution by retroactively voiding private contracts.

293.     Consequently, the Final Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT SEVEN
### (Closed School Discharge Provisions: No Statutory Authority)

294.     Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

295.     The Final Rule's provisions concerning closed school loan discharges are not authorized under the HEA, 20 U.S.C. § 1001 *et seq*.

296.     These provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, which do not permit the Department to rewrite unambiguous language nor grant the Secretary discretion to determine when a school has closed or to impose liability upon affiliated persons.  The regulations are not tied to any specific grant of authority conferred by the HEA and were not otherwise authorized by Congress.

297.     Consequently, the Final Rule's provisions concerning closed school loan discharges are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT EIGHT
### (Closed School Discharge Provisions: Arbitrary & Capricious)

298.     Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

299.    The Final Rule's provisions concerning closed school loan discharges are arbitrary and capricious because, among other reasons, there is no necessary causal connection between a school's closure and harm to an individual borrower.

300.    Consequently, the Final Rule's provisions concerning closed school loan discharges are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

<b>COUNT NINE</b><br/><b>(Closed School Discharge Provisions: Constitutional Violation)</b>

301.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

302.    The Final Rule's provisions concerning closed school loan discharges violate the Due Process Clause of the U.S. Constitution because schools inadequate procedural protections for defending against application or recoupment actions, particularly where the Secretary decides what constitutes a school closure.

303.    Consequently, the Final Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiff prays that this Court:

(a)    Declare the Final Rule unlawful.

(b)    Vacate and set aside the Final Rule.

(c)    Declare that any action taken by Defendants pursuant to the Final Rule is null and void.

(e)     Enjoin Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Final Rule.

(f)     Issue all process necessary and appropriate to postpone the effective date of the regulations and to maintain the status quo pending the conclusion of this case.

(g)     Exercise equitable discretion to declare provisions of the Final Rule inseverable in whole or in part to prevent unfair or prejudicial administration of its provisions.

(h)     Award Plaintiff its costs and reasonable attorneys' fees as appropriate.

(i)     Grant such further and other relief as this Court deems just and proper.

Dated: February 28, 2022          Respectfully submitted,

/s/ Allyson B. Baker
Allyson B. Baker (*pro hac* application forthcoming)
Meredith L. Boylan (*pro hac* application forthcoming)
Stephen B. Kinnaird (*pro hac* application forthcoming)
Michael Murray (*pro hac* application forthcoming)
Sameer P. Sheikh (*pro hac* application forthcoming)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20037
allysonbaker@paulhastings.com
(202)-551-1830

/s/ Philip Vickers
Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Katherine Hancock
Texas Bar No. 24106048
khancock@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
(817) 877-2807 – Fax

*Attorneys for Plaintiff*
*Career Colleges & Schools of Texas*