IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CAREER COLLEGES
& SCHOOLS OF TEXAS,

               Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

               Defendants.

CASE NO.:   4:23-cv-00206-P

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.  The Department Has Limited Authority to Discharge Student Loan Debt ........................ 3

II.  The Biden Administration Makes Debt Cancellation a Top Priority and Declares Its Willingness to Extend or Expand Existing Programs to Accomplish That Goal .............. 4

III.  Stripping Away Protections for Schools and Granting Complete Loan Discharges to Borrowers, the Department's Rule Prioritizes Debt Forgiveness over Due Process.......... 4

IV.  CCST Brings This Action to Ensure That Its Member Schools Continue to Provide a Necessary Pathway to Highly Demanded Skilled Trade Professions in this District and Across the State of Texas ............................................................................. 7

ARGUMENT ........................................................................................................... 8

I.  CCST is Likely to Prevail on the Merits .......................................................... 8

A.  The Department Lacks the Statutory and Constitutional Authority to  Adjudicate Borrower Defense "Claims" or Recoupment Actions Against Schools ......................... 9

B.  The Department's Definitions of Borrower Defenses Are Unlawful. .......................... 15

C.  The Rule's Substantive Presumptions and Full Discharge Requirement Exceed Its Statutory Authority, and Violate the APA and the Due Process Clause ...................... 18

D.  The Department's Closed School Discharge Rule Is Unlawful. .................................. 20

II.  CCST and CCST Schools Have Suffered and Are Likely to Suffer Further Irreparable Injury, Absent the Requested Injunctive Relief ............................................. 20

A.  Substantial Threat of Injury Is Substantiated by Recent Outcomes,  Including in the *Sweet v. Cardona* Litigation .................................................................. 21

B.  CCST and CCST Schools Have Suffered and Will Suffer Harms That Cannot Be Undone .................................................................................................. 23

III.  The Balance of Harms and Public Interest Weigh in Favor of  Preliminary Injunction ................................................................................................ 24

CONCLUSION ....................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021) ................................................................................14

*Allied Home Mortg. Corp. v. Donovan*,
830 F. Supp. 2d 223 (S.D. Tex. 2011) ........................................................8

*Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*,
430 U.S. 442 (1977) .....................................................................................11

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*,
516 U.S. 264 (1996) .....................................................................................11

*Burgess v. FDIC.*,
No. 7:22-CV-00100-O, 2022 WL 17173893 (N.D. Tex. Nov. 6, 2022) ..........................22, 25

*Chemical Mfrs Ass'n v. Dep't of Transp.*,
105 F.3d 702 (D.C. Cir. 1997) ....................................................................19

*Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*,
489 U.S. 561 (1989) .....................................................................................11

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012) ......................................................................21

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) .....................................................................................22

*Equitable Equip. Co. v. Director, Office of Worker's Comp. Programs*,
191 F.3d 630 (5th Cir. 1999) ......................................................................11

*Fed. Maritime Comm'n v. S.C. State Ports Auth.*,
535 U.S. 743 (2002) .....................................................................................11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......................................................................................7

*Granfinanciera, S.A., v. Nordberg*,
492 U.S. 33 (1989) .......................................................................................16

*Irwin v. Dep't of Veterans Affairs*,
498 U.S. 89 (1990) .......................................................................................11

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
 140 S. Ct. 1589 (2020)..............................................................................16

*Mathews v. Eldridge*,
 424 U.S. 319 (1976)..................................................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)....................................................................................17

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
 59 U.S. 272 (1855)..............................................................................11, 13

*National Fuel Gas Supply Corp. v. FERC*,
 811 F.2d 1563 (D.C. Cir. 1987)................................................................11

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
 600 F.3d 562 (5th Cir. 2010) ......................................................................8

*RLC Indus. Co. v. CIR*,
 58 F.3d 413 (9th Cir. 1995) ......................................................................12

*Stern v. Marshall*,
 564 U.S. 462 (2011)..............................................................................11, 16

*Sweet v. Cardone*
 495 F. Supp. 3d 835 (N.D. Cal. 2019) ..........................................21, 22, 23

*Texas v. EPA*,
 829 F.3d 405 (5th Cir. 2016) ................................................................8, 23

*Texas v. EPA*,
 No. 3:23-CV-17, 2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) ............24

*Tull v. United States*,
 481 U.S. 412 (1987)..................................................................................13

*United States v. Nordic Village, Inc.*,
 503 U.S. 30 (1992)..............................................................................11, 12

*West Virginia v. Environmental Protection Agency*,
 142 S. Ct. 2587 (2022)........................................................................11, 14

**Statutes**

5 U.S.C.

 § 705.........................................................................................................8
 § 706(2)(A) ..............................................................................................16

iv

20 U.S.C.

    § 1087(c)(1) ............................................................................................13, 20
    § 1087e(h) .........................................................................................1, 3, 9, 15
    § 1221e-3 .........................................................................................................12

28 U.S.C. § 2072 ...................................................................................................19

31 U.S.C. § 3711(f) ...............................................................................................10

Higher Education Act of 1965 ........................................................................ *passim*

Institutional Eligibility Under the Higher Education Act of 1965.................................1

**Regulations**

34 C.F.R.

    § 668.71(a)(1)-(4) ..........................................................................................17
    § 668.71(c) ..................................................................................................4, 17
    § 668.75.................................................................................................4, 15, 17
    § 668.125...........................................................................................................6
    § 668.501.........................................................................................................15
    § 674.33(g)(1)(ii)(A) .........................................................................................6
    § 682.402(d)(1)(ii)(A) .......................................................................................6
    § 685.206(c) (1995) ........................................................................................10
    § 685.214(a)(2)(i) ..............................................................................................6
    § 685.401.............................................................................................................5
    § 685.401(a) ....................................................................................................18
    § 685.401(b) .........................................................................4, 5, 10, 15, 16, 18
    § 685.401(c) ................................................................................................4, 16
    § 685.401(e) ................................................................................................6, 18
    § 685.402.............................................................................................................5
    § 685.402(a) ......................................................................................................5
    § 685.402(b) ......................................................................................................5
    § 685.403.............................................................................................................5
    § 685.405.............................................................................................................5
    § 685.406(a) ....................................................................................................10
    § 685.406(b)(2) ............................................................................................5, 18
    § 685.406(c) ......................................................................................................5
    § 685.407.............................................................................................................4
    § 685.407(ii) ....................................................................................................16

59 Fed. Reg. 61,664 (Dec. 1, 1994) ............................................................. *passim*

81 Fed. Reg. 75,926 (Nov. 1, 2016).....................................................................13

87 Fed. Reg. 65,904 (Nov. 1, 2022)............................................................. *passim*

**Other Authorities**

Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/closed....................20

U.S. Const. art III.............................................................................................................1, 7, 10, 16

## INTRODUCTION

In furtherance of the Biden Administration's "debt cancellation" agenda, Defendants the U.S. Department of Education ("the Department") and Secretary Miguel Cardona ("the Secretary") (collectively, "Defendants") have engaged in a breathtaking arrogation of power.

In Section 455(h) of the Higher Education Act ("HEA"), Congress granted the Department a very specific and limited rulemaking power: to "specify in regulations *which acts or omissions* of an institution of higher education a borrower may assert as a defense to repayment" to loans made under the William D. Ford Federal Direct Loan ("Direct Loan") program. 20 U.S.C. § 1087e(h) (emphasis added).  From that single sentence, the Department issued a sprawling rule. *See* Institutional Eligibility Under the Higher Education Act of 1965, 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule").

The Rule converts defenses into affirmative borrower "claims" that are not subject to limitations periods; and proclaims the Department's authority to adjudicate not only borrower claims but also recoupment actions against schools.   The Department even declares the power to adjudicate administratively borrower claims that arise under state law, such as breach of contract. These provisions not only exceed the Department's authority but are also unconstitutional.  Only Congress can authorize the administrative adjudication of public rights, and (for borrower claims against the Secretary) only Congress can waive sovereign immunity.  Moreover, state law claims are not public rights. Accordingly, the Rule violates Article III, the Seventh and Tenth Amendments, and principles of separation of powers and federalism.  Not only is there no colorable statutory authority for the Rule, but the "major questions" canon prohibits an agency from claiming extraordinary and constitutionally suspect powers from obscure statutes.

The Department compounded this overreach by stacking the deck in favor of borrowers and against schools. The Rule's substantive definitions of borrower defenses include unintentional and innocent erroneous representations or omissions—imposing a form of strict liability—even absent any proof of harm to the borrower.  The Rule permits claims to be brought on behalf of groups of borrowers (without traditional class action safeguards), and creates the unfounded presumption that the entire class relied upon misrepresentations or were otherwise injured by prohibited institutional acts or omissions—without the need to provide an iota of proof.  The Rule declares, without reasoned basis, that a similar presumption would apply to claims against "closed schools", which the Rule expansively defines to include *open* schools that have moved or consolidated campuses to provide improved facilities or meet student demand.

Although reliance and injury is information possessed by the borrower alone, the Rule denies schools discovery or the opportunity to examine evidence or witnesses, which are standard features of administrative adjudication, thus rendering rebuttal of the presumptions practically impossible.  And if a borrower defense is proven, the Rule declares that the borrower's *entire student debt* is discharged, without any proof of what financial harm actually resulted from the institutional act or omission, and even though Congress granted the Department no rulemaking authority over discharge amounts.

The Rule's objective is to "streamline" claim approval, without regard to actual proof, statutory or constitutional authority—ultimately leaving schools and taxpayers to foot the bill for the Department's backdoor loan forgiveness program. Given the ease with which total loan forgiveness can now be secured, come July 1, 2023, proprietary schools across the country will find themselves defenseless in the face of a torrent of borrower defense claims.

Even while this litigation is pending, Texas schools suffer consequent injury that cannot be undone.  Member schools of Plaintiff Career Colleges and Schools of Texas ("CCST") face an immediate quandary in conforming conduct to the Department's new conflicting strict-liability standards—pursuant to which, inadvertent erroneous representations are grounds for loan discharges, but so are erroneous omissions of fact.  CCST and its member schools have been forced to divert extensive resources in order to revamp compliance programs and prepare for a deluge of meritless borrower defense claims that will be adjudicated pursuant to the Rule's strict liability standard and deficient processes; and have been forced to abandon plans to build, expand, or consolidate campuses or facilities in the face of near unlimited liability stemming from the new regulations governing closed schools.

Accordingly, CCST respectfully requests that the Court enter an order of injunctive relief to stay implementation of and enjoin the Department from enforcing the Rule pending adjudication of the merits of a final and permanent injunction. Absent the requested relief, the Rule threatens irreparable harm to schools—including and especially CCST and its member schools—and, by extension, current and future generations of students in this State and across the country.

## BACKGROUND

### I.      The Department Has Limited Authority to Discharge Student Loan Debt

In a minor provision of the HEA, Congress granted the Department a very specific and limited rulemaking power: to "specify in regulations *which acts or omissions* of an institution of higher education a borrower may assert as a defense to repayment of a loan made under" the Direct Loan Program.  20 U.S.C. § 1087e(h) (emphasis added).

II.     **The Biden Administration Makes Debt Cancellation a Top Priority and Declares Its Willingness to Extend or Expand Existing Programs to Accomplish That Goal**

The Biden Administration has made it no secret that one of its top priorities is the cancellation or forgiveness of hundreds of billions of dollars in student borrower debt. *See* CCST Complaint ("Compl.") ¶ 42. Indeed, prior to promulgating the Rule, the administration declared its willingness to pursue these ends by extending or expanding pre-existing programs or regulations, including those that the Rule would subsequently amend. *See id.* ¶ 43 (citing public statements made by administration officials about their intent to "expand[] a handful of programs that were already on the books.").

III.    **Stripping Away Protections for Schools and Granting Complete Loan Discharges to Borrowers, the Department's Rule Prioritizes Debt Forgiveness over Due Process**

The Rule was promulgated with undue haste, and without a proper cost/benefit or budgetary analysis. *See* Compl. ¶¶ 53-56, 233-240.  CCST's Complaint discusses each aspect of the Rule at ¶¶ 57-76, but the following provisions are relevant to this motion.

1.      *Borrower Defenses to Repayment.*  Articulating a new federal standard, the Rule recognizes five grounds on which a borrower defense claim may be brought: (1) "substantial" misrepresentation under the new uniform federal standard; (2) "substantial" omission of fact; (3) breach of contract; (4) aggressive or deceptive recruitment; or (5) a state or federal judgment or final Department action against an institution that could give rise to a borrower defense claim. *See* 34 C.F.R. § 685.401(b)(1)–(5) (Citations to the C.F.R. refer to provisions upon codification of the Rule unless otherwise stated.  *See* 87 Fed. Reg. 66,039-66,073 (setting forth Rule amendments to the C.F.R.)).  If the borrower does not prevail, on reconsideration, borrowers whose loans were disbursed before July 1, 2017 get a second bite at the apple by proving any cause of action they have against the school under state law.  *Id.* §§ 685.401(c), 685.407.  A misrepresentation is deemed substantial if a borrower reasonably relied upon it or "could reasonably be expected to

4

rely" upon it to his or her detriment.  *Id.* § 668.71(c). A substantial omission of fact may be "the concealment, suppression, or *absence* of material information [relating to] [t]he nature of the institution's educational programs, the institution's financial charges, or the employability of the institution's graduates." *Id.* § 668.75 (emphasis added). Because a misrepresentation need not be intentional, knowing, or negligent, 87 Fed. Reg. at 65,921, and any "absence of material information" is actionable, schools face strict liability for erroneous representations or omissions.

2. *Borrower Claim Adjudication.*  The Rule provides for both individual and group adjudication of borrower defense claims, *id.* §§ 685.402, 685.403, although the Rule authorizes the Department only to specify institutional acts or omissions that can be asserted as defenses, and does not authorize adjudication.  The so-called claims are not subject to a limitation period; they may be filed "at any time," so long as the borrower has a balance due on a direct loan or any loan that may be consolidated into a direct loan. *Id.* § 685.401(b).

The Secretary may initiate a group process upon the Department's own determination, creating a group based on federal or state law enforcement activity, individual claims, and/or lawsuits filed against institutions. *Id.* § 685.402(a), (b). The Rule also permits state government entities and legal assistance organizations to initiate the group claim process. *See* 87 Fed. Reg. at 65,938; 34 C.F.R. § 685.401. For group processes, to avoid adjudication of issues requiring individualized proof, the Department has established a special "rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2).  Although the regulations provide for an institutional response to an allegation of wrongdoing, the regulations provide no opportunity for the institution to discover or test evidence

proffered by the borrower(s) or to cross-examine any borrower or purported witness. *Id.* §§ 685.405, 685.406(b), (c).

3. *Full Discharge.*  The Rule abolishes the current requirement that a borrower prove financial harm, and fully discharges the borrower's total paid and unpaid debt if a defense is proven, no matter whether that debt was caused by (or even antecedent to) the act or omission. *See* 87 Fed. Reg. 65,946; 34 C.F.R. § 685.401(b) (*Borrower defense to repayment*, (i)-(ii)).

4. *Recoupment Adjudication.*  The Rule establishes a separate and unfair process through which the Department can seek recoupment against schools for loan discharges the Department approved. *See* 34 C.F.R. § 668.125.  The Rule shifts the burden to the school to prove that the defense was improper, but restricts the evidence schools can adduce and fails to provide schools with the opportunity to conduct discovery or examine witnesses. *See* Compl. ¶¶ 215-227.

5. *Closed School Discharge.*  Under the Closed School Discharge provision, students whose schools are deemed to be "closed" either during or shortly after attendance would be eligible to have their loans discharged. 87 Fed. Reg. 65,913. Further, the Department had made clear that it will seek to recover funds from the institutions that are subject to this provision. *Id.*

The Rule affords the Secretary wide discretion in determining the date that the school "closed," which is the earlier of whichever date the Secretary decides is when the school ceased to provide instruction in "most" programs or for "most of its students." 34 C.F.R. §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), 685.214(a)(2)(i).   To maximize recovery, the Department relieves attendees of closed schools of having to prove the usual burden that they have suffered detriment warranting full relief.  *Id.* § 685.401(e).

IV.  **CCST Brings This Action to Ensure That Its Member Schools Continue to Provide a Necessary Pathway to Highly Demanded Skilled Trade Professions in this District and Across the State of Texas**

CCST is a trade association whose express mission is to represent and protect the interests of its career education member schools and, more broadly, career education as a whole in Texas. *See* Decl. England ¶8 [App-23]. CCST's membership consists of more than 70 postsecondary schools, institutes, colleges, and universities (collectively, the "CCST Schools"), which reside not only in the Northern District of Texas and the Fort Worth Division, but across the State of Texas. *See id.* ¶6 [App-23]. The majority of CCST Schools, or 54 of the more than 70 schools in its membership, which includes schools in this District and the Fort Worth Division (collectively, the "Fort Worth Schools"), participate in the Direct Loan Program and are thus subject to the Rule. *See id.* ¶19 [App-25]. Moreover, a large number of students and graduates of CCST member schools, especially the Fort Worth Schools, who hold federal student debt and can file borrower defense to repayment claims (regardless of the merits) reside in this District and the Fort Worth Division. *See* Decl. Shaw ¶¶ 9-12 [App-32]; Decl. Arthur ¶¶ 12-13 [App-39].

CCST Schools have trained, and are responsible for training, thousands of students to serve in highly demanded skilled professions, including nurses and medical assistants, welders, HVAC repair technicians, and trucking maintenance and automotive technology specialists. *See* Decl. Shaw ¶6. These are professions that are essential to not only the communities in this District but the State of Texas as a whole. *See* Decl. England ¶ 7 [App-23].  CCST's members are also injured because they are directly regulated and required to conform to unlawful substantive standards; required to submit to unauthorized agency adjudication in violation of constitutional rights; and subject to skewed presumptions and one-sided procedures that will subject them to massive and (for some schools) potentially existential liability. *See* Decl. Jones ¶¶ 20-36 [App-6—11].

CCST is also injured by the rule in its own right. *See* Decl. England ¶¶ 27-37 [App-27—28].  As a trade association, CCST has Article III standing to bring suit on behalf of its member schools because (1) the schools themselves would have standing, (2) the rulemaking at issue is germane to CCST's purpose, and (3) the participation of CCST's individual members is not required because the Rule applies equally to all of them, and all of the challenges brought are legal. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  CCST seeks preliminary injunctive relief to avert irreparable injury from the Defendant's unlawful action and to preserve the status quo ante.

## ARGUMENT

A plaintiff is entitled to a preliminary injunction if it is "likely to succeed on the merits," "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [its] favor," and an injunction "is in the public interest." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568-69 (5th Cir. 2010).  The same factors govern motions to postpone the effective date of agency action under 5 U.S.C. §705. *See Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016).  CCST meets each requirement for preliminary injunctive relief.

## I.      CCST is Likely to Prevail on the Merits

To be entitled to an order of preliminary injunction, a plaintiff neither has to "demonstrate that he is certain to win" nor that he "is entitled to a summary judgment." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 595-96 (5th Cir. 1974)). Rather, "[i]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult[,] and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

In evaluating the likely success on the merits, "the court considers the 'standards provided by the substantive law.'" *Id.* (quoting *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011)).

A. The Department Lacks the Statutory and Constitutional Authority to
    Adjudicate Borrower Defense "Claims" or Recoupment Actions Against Schools.

Section 455(h) of the HEA provides, in pertinent part, that:

> the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan . . . except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under [the Direct Loan Program], an amount in excess of the amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h).

i.      *Section 455(h) Does Not Authorize The Secretary to
    Define Borrower Defense "Claims" Against The Government.*

Section 455(h) is limited in scope and plain in meaning.  The Secretary is directed to promulgate regulations to identify "acts or omissions" of schools "a borrower may *assert as a defense* to repayment of a loan."  20 U.S.C. § 1087e(h) (emphasis added).  Because defendants assert defenses, Section 455(h) contemplates that the Secretary's regulations shall specify defenses that a borrower would assert when defending an action for repayment.  This is confirmed in the next clause, which addresses circumstances when a defense would entitle the borrower to recover money already paid: "in no event may a borrower recover from the Secretary, in any *action* arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan."  *Id.* (emphasis added).  An action is a judicial proceeding.  *See* Legal Information Institute, Wex, "action," https://www.law.cornell.edu/wex/action (June 2022).

It is apparent from its face that this provision enables the Department to specify *defenses* to repayment that a borrower may assert in collection actions, and not to invent *affirmative* claims.  Indeed, the Department so interpreted Section 455(h), shortly after its enactment in 1994.  The

9

Department declared that, if the Secretary or other authorized person brings "an action" for repayment, the borrower "may assert as a defense" an institutional act or omission specified in Department regulations.  59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).  Such a "defense" would be asserted in existing collection proceedings: "*In any proceeding to collect on a Direct Loan,* the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34  C.F.R.  §  685.206(c)  (1995)  (emphasis  added).    The  Department  commented  that  "the regulations identify *formal proceedings* in which borrowers may raise the acts or omissions of the school as a defense against collection of the loan," 59 Fed. Reg. at 61,671 (emphasis added), which would include "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings  under  Section  488A  of  the  Act";  "(iii)  Salary  offset  proceedings  for  Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. § 3711(f)."  *Id.* at 61,696.

The Rule, by contrast, prescribes an elaborate system for the adjudication of "borrower defense claim[s]," *see* 34 C.F.R. § 685.406(a), and indeed allows such claims to be brought and decided "at any time" (without any limitation period), *id.* § 685.401(b).  The Department's action exceeds its statutory authority.

ii.      Congress Did Not Authorize The Secretary To Adjudicate Borrower Defense Claims.

Not only does the Rule depart from the statutory text by converting borrower defenses into affirmative claims, but it also improperly fashions out of whole cloth adjudicatory processes designed to implement a policy of massive loan forgiveness and shift liability to institutions.  Even if Section 455(h) authorized the creation of oxymoronic borrower defense "claims," nothing in the statute authorizes the Department to adjudicate such claims.

10

The judicial power of the United States is vested in Article III courts, U.S. Const. art III, but Congress may assign to administrative tribunals the adjudication of "public rights": namely, "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern v. Marshall*, 564 U.S. 462, 490 (2011).  But this prerogative belongs to Congress alone:  "[C]ongress may or may not bring [public rights] within the cognizance of the courts of the United States, as it may deem proper." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855); *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 452, 460–61 (1977).

"Agencies have only those powers given to them by Congress," *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2609 (2022), and Congress must *explicitly* grant the power of adjudication to agencies, *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987).  Courts have repeatedly denied agencies adjudicatory powers that were not expressly conferred by Congress.  *See*, *e.g.*, *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 273-75 (1996); *Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*, 489 U.S. 561, 572-74 (1989); *Equitable Equip. Co. v. Director, Office of Worker's Comp. Programs,* 191 F.3d 630, 632-33 (5th Cir. 1999).

Moreover, the Rule purports to authorize administrative adjudication of claims for financial relief against the Government.  *See* 87 Fed. Reg. at 65,910 (borrower defense claims assert rights against government, not schools), *id.* at 65,941, 65,945.  Because such claims require a waiver of sovereign immunity, congressional authorization must be not only express but unequivocal.  Sovereign immunity applies to administrative adjudication, *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760-61 (2002), and Congress must "'unequivocally express[]'" its

11

intention to waive sovereign immunity in the statutory text. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, 37 (1992) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990)). "A waiver of sovereign immunity cannot be implied." *Irwin*, 498 U.S. at 95. The Government's consent to be sued "must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires." *Nordic Village*, 503 U.S. at 34 (internal quotation marks, brackets, and ellipsis omitted).

There is no express, much less unequivocal, statutory authorization of borrower defense claims against the Government. Section 455(h) gives the Department rulemaking power *to define* borrower defenses based on institutional acts and omissions; it grants no power to *adjudicate* borrower defenses, much less claims. The power to make rules does not subsume the power to adjudicate violation of those rules. *See RLC Indus. Co. v. CIR*, 58 F.3d 413, 417-18 (9th Cir. 1995).

The Department claims the authority to adjudicate because Congress has granted it rulemaking authority to "carry out functions otherwise vested in the Secretary," 20 U.S.C. § 1221e-3, and to "manage the functions of the Secretary or the Department," *id.* § 3474. *See* 87 Fed. Reg. at 65,910. Generalized rulemaking grants do not constitute the express authorization required for public-rights adjudications, much less waivers of sovereign immunity. Regardless, those provisions are inapplicable because Congress did not vest the Secretary with the "functions" of adjudicating borrower defenses to repayment. The adjudication of borrower defense claims is beyond the Department's statutory authority and violates the separation of powers.

       iii.        *Section 455(h) Does Not Authorize The Secretary To Adjudicate Recoupment Actions Against Schools.*

For all the same reasons, the statutes cited by the Department (Section 455(h) and the general rulemaking grants) do not authorize the adjudication of recoupment actions against schools after a borrower defense claim has been granted.

The Department dismissed challenges to its statutory authority on the grounds that "Sec[tion] 454(a)(3) of the HEA provides that an institution must accept responsibility and financial liability stemming from its failure to perform the functions set forth in its PPA [Program Participation Agreement]—the signed document required for participating in the Federal financial aid programs through which the institution and other relevant parties agree to abide by the rules and requirements governing the programs." 87 Fed. Reg. at 65,948 (citing 20 U.S.C. § 1087d (a)(3)). But that provision does not address how financial liability should be adjudicated, whether by the courts or the Department.

Section 454(a)(3) stands in stark contrast to other parts of the HEA, which do provide the Department such authority. *See, e.g.*, 20 U.S.C. § 1087(c)(1) (in cases of false certification, closed schools, and lender refunds, granting Secretary specific authority to "subsequently pursue any claim available to such borrower against the institution"). Thus, even if recoupment were *arguendo* a public right, it is not one that Congress has assigned to the agency to adjudicate rather than the courts. Section 454(a)(3) does not by itself connect an institution's "responsibility and financial liability" to the Department's discharge of loans related to borrower defense and it would be odd to infer it did so in light of specific statutory grant of such authority elsewhere in the HEA.

Furthermore, the Department has acknowledged that any recoupment right "arises not by virtue of any statutory requirement, but under common law." Student Assistance General Provisions, 81 Fed. Reg. 75,926, 75,929 (Nov. 1, 2016). Congress could not have granted the Department the power to adjudicate recoupment actions even if it wanted to, for it cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law …." *Murray's Lessee*, 59 U.S. at 284. Indeed, the Seventh Amendment provides

that "the right of trial by jury shall be preserved . . ." in actions for monetary recovery at common law. *Tull v. United States*, 481 U.S. 412, 417 (1987)

        iv.       *The Major Questions Canon Militates Against Finding Statutory Authority For The Rule.*

Not only is there no textual hook for the Department's novel adjudicatory and liability-shifting scheme, but one would not expect Congress to grant such far-reaching authority on such a slender statutory basis.  As the U.S. Supreme Court recently admonished in *West Virginia v. EPA*, 142 S. Ct. at 2608, the fundamental inquiry into agency authority is "whether Congress in fact meant to confer the power the agency has asserted."  Under the major questions doctrine, an act of vast "economic and political significance" must be viewed in light of the "history and the breadth of the authority . . . asserted." *Id.* Delegations of extraordinary powers should not be readily gleaned from "ancillary" and "rarely used" statutory provisions. *Id.* at 2610-11.

Section 455(h) is a minor provision of the HEA that, in its first two decades of existence, had rarely been invoked.  87 Fed. Reg. at 65,979 ("[T]he [borrower defense] process . . . was rarely used prior to 2015.").  The Department cannot refashion its modest authority to define borrower defenses into a wellspring of power to achieve massive loan forgiveness, a controversial maneuver that may impose billions of dollars of burden on the public fisc and existential liability on post-secondary schools that are vital to the country's economic future.  *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (holding that an economic impact of $50 billion had vast significance).

As the Department recognized when it disavowed the power to cancel loan debt e*n masse*, "Congress does not impliedly delegate a policy decision of massive economic and political magnitude – as blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, or the material modification of the repayment terms or amounts thereof,

surely would be – to an administrative agency."  U.S. Department of Education, Office of the General Counsel, Memorandum to the Secretary Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority, at 2 (Jan. 12, 2021).  So too Congress did not delegate in obscure fashion the broad debt-cancellation and liability-shifting powers exercised in the Rule.

B.  <u>The Department's Definitions of Borrower Defenses Are Unlawful.</u>

Section 455(h) commands that the Secretary "specify in regulations *which acts or omissions* of an institution of higher education" can be asserted as a defense. 20 U.S.C. § 1087e(h) (emphasis added). This requires the Department to define actual acts or omissions with enough specificity so that regulated parties can conform their conduct accordingly.

The Department's definitions of substantive borrower defenses do not comply with that mandate.  First, the Department creates a novel defense of "[a]ggressive and deceptive recruitment tactics or conduct," but the Rule does not define that term, instead listing six non-exclusive examples and arrogating to the Department the discretion to determine, on a case-by-case basis, what qualifies as "aggressive." 34. C.F.R. § 668.501.

Second, the Department creates a freestanding defense for *any* omission of a fact that a reasonable person merely "would have considered … in making a decision to enroll or continue attendance," *id.* § 668.75, but that open-ended rule falls short of specifying "which … omissions" relieve the borrower of his loan obligations.  20 U.S.C. § 1087e(h).  Third, the Department recognizes as a "borrower defense" a "favorable judgment" against an institution "based on State or federal law", or any Departmental sanction or adverse action, "based on the institution's acts or omissions" that could otherwise give rise to a borrower defense claim under the new federal standard. 34 C.F.R. § 685.401(b)(5)(i)-(ii). But judgments and Departmental sanctions and adverse actions are not acts or omissions of institutions; the Department has thus abdicated its duty to

15

specify the acts or omissions and has failed to analyze why such acts justify relief, which is the expert decision that Congress delegated to the Secretary.  These latter provisions are arbitrary and capricious end-runs around the rules of claim preclusion—which bar additional recovery on the claims embodied in the judgment, *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594–95 (2020)—and issue preclusion.

In addition, the Department cannot arrogate to itself the power to adjudicate and enforce state law, such as breach of contract, 34 C.F.R. § 685.401(b)(3); state law underlying judgments, *id.* § 685.401(b)(5); and "any applicable State law standard," which borrowers may raise on reconsideration if their federal claims fail, *id.* § 685.407(ii), "without regard to any State statute of limitations," *id.* § 685.401(c). Because breach-of-contract and many other state claims are not public rights susceptible of administrative adjudication, and litigants have a right to a jury trial of such claims in federal court, the Department's rule violates Article III and the Seventh Amendment. *See, e.g.*, *Stern*, 564 U.S. at 490–91(finding that that a State law counterclaim was not a public right); *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 51-52 (1989) ("[Congress] lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").

The Department violates the Tenth Amendment and principles of federalism by pre-empting or modifying state law rights without congressional authorization.  The Department has no warrant to nullify state limitations periods.  And in fashioning monetary relief for contract breaches that can eventually be recouped from schools, the Department is impermissibly abrogating state damages laws by awarding a form of consequential damages to borrowers who have shown no causal connection to a breach, or established their efforts to mitigate or avoid such damages.  *See, e.g.*, Restatement (Second) of Contract §§ 344-351 (1981).

16

Finally, the Rule's "misrepresentation" and "omission" defenses are arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A). A federal agency has a duty to reach substantively reasonable conclusions based on the record before it and to explain its reasoning. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department failed to do that here.

The Department imposes a strict-liability standard for misrepresentation and omissions of fact, with no requirement to prove intent to deceive or indeed any form of culpability (such as negligence). *See* 34 C.F.R. §§ 668.71(c), 668.75; *see* Compl. ¶¶ 91, 97-99. Because a loan that is discharged will presumptively trigger liability against the school, this standard dramatically increases the risk that a school will be subject to enormous liability based on innocent misstatements or omissions made by its employees or contractors. Furthermore, the Department uses its new misrepresentation standard not only to grant relief to injured borrowers, but to fine schools and revoke, restrict, or deny their participation in the federal student loan program even without proof of borrower detriment.  34 C.F.R. § 668.71(a)(1)-(4).

The Department's first rationale for eliminating this requirement is that "[r]equiring intent would place too great a burden on an individual borrower."  87 Fed. Reg. at 65,921.  But that burden—which plaintiffs in any fraud action must bear—does not outweigh the potentially substantial liabilities faced by schools as a result, nor the consequences for students, employees, and communities that such liabilities would cause. Second, the Department notes that "if the action resulted in detriment to the borrower that warrants relief, the Department does not believe whether it was taken with knowledge or intent should be relevant."  *Id.*  But that justification does not withstand scrutiny because the Department will presume the existence and causation of detriment without proof in two of the most common circumstances in which is relief is likely to be granted

17

(group and closed-school claims). *See* 34 C.F.R. §§ 401(b), 685.401(e). It is arbitrary and capricious to sanction a school for innocent and unintentional misstatements or omissions of fact, especially without any proof anyone actually relied upon them or was injured thereby.

C. <u>The Rule's Substantive Presumptions and Full Discharge Requirement Exceed Its Statutory Authority, and Violate the APA and the Due Process Clause</u>

The Department has recognized that a "borrower defense to repayment" requires an act or omission of a school relating to enrollment or borrowing "that caused the borrower detriment." 34 C.F.R. § 685.401(a). Even though injury is the crux of any section 455(h) defense, the Department has created unwarranted evidentiary presumptions of injury to favor borrowers. First, for any group claim "for which the Department official determines that there may be a borrower defense under § 685.401(b), there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2). Second, "[f]or borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section." *Id.* § 685.401(e).

These presumptions—coupled with the rule that a borrower who establishes a defense receives a full discharge of all his debt, even if not antecedent to or connected to the violation, 34 C.F.R. § 685. 401(a) (Subsections (i)-(ii))—reveal that the Department's purpose is maximum loan forgiveness, not rational administration of borrower defenses.

The Department has no statutory authority to create either presumptions or discharge amounts. The Department's limited rulemaking authority under Section 455(h) extends only to specifying institutional acts or omissions that can serve as borrower defenses to loan repayment, not defining how defenses or discharge amounts may be proven.

18

Furthermore, even if such authority exists, it is arbitrary and capricious for an agency to create rebuttable presumptions where there is no rational nexus between proven and presumed facts (*i.e.*, where proof of one fact does not render so probable the existence of a second fact that it is unnecessary to prove it). *See, e.g.*, *Chemical Mfrs Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703-05 (D.C. Cir. 1997).

Under the group-claim presumption, a presumption of detriment warranting relief arises simply if the Department official finds that an act or omission occurred. Proof of an act or omission does not logically mean that any borrower was detrimentally affected by it, much less that all borrowers were. Nor is it logical to presume that the detriment warrants total forgiveness of debt and reimbursement of past payments. Furthermore, it is arbitrary and capricious, and contrary to due process, for the application of a certain procedure to affect substantial rights. *See, e.g.*, 28 U.S.C. § 2072 (Federal Rules Enabling Act providing that procedural rules, including class action rules, "shall not abridge, enlarge or modify any substantive right"). The fact that a particular borrower's claim is adjudicated in a group rather than an individual proceeding should not affect the outcome or reduce the proof required.

It is also arbitrary and capricious to apply a special presumption when the borrower attended a school that is now closed (which can happen for innumerable reasons). The presumptions purport to be rebuttable, but the Rule includes no provision for a school to secure the evidence necessary to rebut the presumption. Information concerning a borrower's reliance and injury are fully within the possession and control of the borrower, but in neither the borrower defense nor recoupment process does the Rule permit discovery from, or witness examination of, borrowers. Given the high private stakes (including potential existential liability for schools), the high risk of error from slanted procedures, and the value of traditional administrative-adjudication

19

safeguards like discovery and trial, the Rule violates due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

    D.   <u>The Department's Closed School Discharge Rule Is Unlawful.</u>

The challenged regulations unduly expand the definition of a "closed school" in order to allow more borrowers to discharge their loans on that basis. Under the new regulation, the Department can decide that a school has closed when it stops providing instruction in "most" programs, "as determined by the Secretary," or "when the school ha[s] ceased to provide educational instruction for most of its students." 87 Fed. Reg. at 65,966. This goes beyond the Department's authority under the HEA, which contemplates discharge of a loan when a student "is unable to complete the program in which such student is enrolled due to the closure of the institution." 20 USC § 1087(c)(1).

The plain meaning of "closed" is "not open." *See Closed*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/closed. A school that closes a part of its campus, downsizes a department or program, or reduces its enrollment size, has not "closed" in the plain sense of the word. Yet the Rule establishes amorphous criteria to provide the Department with broad discretion to decide that a school has "closed" and that its current and recent students' loans should be completely discharged, which then places liability on the school or its affiliates for that amount. This stretches the plain text of the statute beyond its reasonable limits.

## II.    CCST and CCST Schools Have Suffered and Are Likely to Suffer Further Irreparable Injury, Absent the Requested Injunctive Relief

CCST, CCST Schools, and schools across the country participating in the Direct Loan Program have suffered and will continue to suffer a cognizable injury, unless and until an order of injunctive relief is granted. Further, there is a substantial threat of significant irreparable injury

upon the impending effective date if the injunctive relief is not granted.  Accordingly, CCST satisfies the injury prong of the preliminary injunctive analysis.

"[W]hen the threatened harm is more than de minimis, it is not so much the magnitude but the *irreparability* that counts for purposes of a preliminary injunction. It is thus well-established that an injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon*, *Inc*. *v*. *City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). Here, the financial harms that CCST and CCST Schools have suffered and will suffer cannot be remedied upon CCST prevailing on the merits of its case.

A. Substantial Threat of Injury Is Substantiated by Recent Outcomes, Including in the *Sweet v. Cardona* Litigation

Upon the July 1, 2023 effective date, there is a substantial threat of immediate injury to CCST Schools that places their viability in question. As earlier discussed, the Rule's borrower-friendly standard and adjudication process are almost certain to result in schools in Texas and across the country being suddenly inundated by tens of thousands of borrower defense claims that will be subject to a rubber-stamp process that presumes liability, provides schools with no notice, permits tag-along claims, and incentivizes borrowers with the prospect of large dollar loan discharges without risk or downside to submitting a claim.

Indeed, this phenomenon has occurred before, most recently in *Sweet. v. Cardona* (previously, *Sweet v. DeVos*), 495 F. Supp. 3d 835 (N.D. Cal. 2019) ("*Sweet*").  In *Sweet*, the Department entered into an orchestrated, proposed settlement, the terms of which included complete federal loan discharges and refunds of amounts paid for plaintiffs and any borrower who attended for-profit institutions on a specified list of schools. *See id.*  The mere prospect of complete loan discharges for graduates of the specified schools led to a torrent of borrower defense applications. In response to Judge Alsup's inquiry, the Department informed the N.D. Cal. court

21

that, in the weeks following the settlement agreement's execution, "***250,000 [borrower defense] applications***" had been submitted "***from approximately 206,000 borrowers who attended approximately 4,000 schools***." *Sweet*, Response to Court's Inquiry Concerning Number of Post-Class Applicants, 3:19-cv-03674 (N.D. Cal Feb. 16, 2023), ECF No.380 (emphasis added), [App-47].

There is substantial reason to believe the outcome will be the same following the July 1 effective date. Indeed, there is no "specified list of schools" in the Rule, and thus the number of applications submitted is likely to be several times larger. The financial and reputational harm that will result from schools having to defend against a deluge of borrower defense claims—while being subject to an adjudicatory process that imposes a strict-liability standard, and deprives schools of due process protections and appeal rights—will be immediate and irreparable, and cannot be undone. In fact, for smaller schools, including those that make up CCST's membership, the harm described poses an existential threat. *See* Decl. Jones ¶¶ 34 [App-10]; *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (concluding that threat of bankruptcy was "[c]ertainly" enough to demonstrate irreparable harm and warrant a preliminary injunction).

Regardless, the harms of infringing on participating schools' constitutional rights are irreparable per se. "[T]hat a violation of a constitutional right in and of itself constitutes irreparable injury has been universally recognized and is not open to debate." *Burgess v. FDIC.*, No. 7:22-CV-00100-O, 2022 WL 17173893, at *11 (N.D. Tex. Nov. 6, 2022). This includes the likely deprivation of a participating school's Seventh Amendment right to a jury. *See id.* ("Since the Court has determined that Plaintiff was entitled under the Seventh Amendment to a jury trial, the irreparable injury requirement is automatically satisfied without the need to consider Plaintiff's particular showings of irreparable harm."). As shown by the deluge of filings after the *Sweet*

settlement, the probability is significant that at least some CCST member schools will be subject to unconstitutional recoupment proceedings. This alone constitutes irreparable injury.

B. <u>CCST and CCST Schools Have Suffered and Will Suffer Harms That Cannot Be Undone</u>

The Fifth Circuit has held that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)). Here, CCST and CCST Schools continue to undertake significant efforts and investment of resources toward complying with the impending Rule. *See* Decl. England ¶¶ 21, 30 [App-25, 27]; Decl. Shaw ¶ 20 [App-33]; Decl. Arthur ¶¶ 16-20 [App-39—41].

In advance of the July 1, 2023 effective date, CCST Schools will necessarily expend substantial time and financial resources into undertaking efforts to conform their conduct, recordkeeping activity, and compliance efforts, and abandoning longstanding business plans to build new and upgrade or consolidate existing schools, all in an effort to mitigate the risk of reputational injury, substantial financial liability, and exclusion from (or restriction upon) participation in the federal student loan programs, based on the new standard and processes set forth under the Rule. *See* Decl. Jones ¶ 8 [App-4]; Decl. Arthur ¶¶ 16-20 [App-39—41]. These are not harms that can be remedied upon prevailing on the merits of the case.

On account of the Rule's amorphous criteria for what constitutes a "closed school", CCST Schools have been forced to abandon plans to build new campuses, transition students away from older facilities and to new and improved, or otherwise consolidate campuses in order to expand educational offerings or otherwise improve student experiences. *See* Decl. Arthur ¶¶ 22-26 [App-41—42]. Indeed, there is legitimate concern that the Department would invoke its broad discretion to determine that the school "closure" criteria are met, thus resulting in complete loan discharges

for borrowers and recoupment against schools. *See* Decl. Jones ¶¶ 30-34 [App-9—10]. The effect of these forced business actions is lost business opportunity in addition to loss of time and investment made. *See id.* These are not harms that can be remedied by CCST's prevailing on the merits of its case.

Finally, CCST itself is being forced to divert substantial time and resources away from existing advocacy and educational programs and toward assisting CCST Schools with necessary compliance initiatives, including but not limited to extensive data preservation and recordkeeping and organization efforts, given the effect of the Rule's newly imposed requirements. *See* Decl. England ¶¶ 27-32 [App-27—28]. The demand for time and further financial resources will only increase as the effective date draws near.  Accordingly, CCST has satisfied the injury prong of the preliminary injunction analysis.

## III.   The Balance of Harms and Public Interest Weigh in Favor of Preliminary Injunction

"'Once an applicant satisfies the first two factors,' the equities and public-interest factors 'merge when the Government is the opposing party.'" *Texas v. EPA*, No. 3:23-CV-17, 2023 WL 2574591, at *11 (S.D. Tex. Mar. 19, 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The balance of harms and the public interest favor a preliminary injunction.

Schools subject to the new regulations will be—and have been—significantly harmed through the compliance costs needed to anticipate and comply with the regulations' new substantive requirements. In addition, to the extent the Department adjudicates borrower-defense claims and recoupments against schools before this action is finally adjudicated, the potential liability could be substantial and, for many schools, existential. Schools will be forced to close, end programs, lay off employees, or increase tuition as a result, causing irreparable harm. Allowing the Department to implement the new regulations, only to have them vacated after a final

24

adjudication, would also cause significant disruption to regulated entities, borrowers, and other parties affected by them. Commencing discharge and recoupment proceedings that are later invalidated would only waste borrower, school, and government resources.

By contrast, delaying the implementation of the new regulations would not harm the Defendants. Regardless, "[a]s to the public interest, '[a]n injunction does not disserve the public interest when it prevents constitutional deprivations.'" *Burgess*, 2022 WL 17173893, at *12 (quoting *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022)). The deprivation of participating schools' constitutional rights is therefore dispositive of this factor.

## CONCLUSION

For these reasons and those set forth in the Complaint, CCST respectfully requests an order of preliminary injunction delaying implementation of the Rule prior to its July 1, 2023 effective date and otherwise enjoining Defendants from implementing or enforcing any provision of the Rule, or adjudicating any borrower defense to repayment claims pursuant to the standard and processes prescribed under the Rule, anywhere within the jurisdiction of the Department, until this action is resolved.

Dated:  April 5, 2023

/s/ Allyson B. Baker
Allyson B. Baker (*pro hac vice*)
Meredith L. Boylan (*pro hac vice*)
Stephen B. Kinnaird (*pro hac vice*)
Michael Murray (*pro hac vice*)
Sameer P. Sheikh (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20037
allysonbaker@paulhastings.com
(202)-551-1830

/s/ Philip Vickers
Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Katherine Hancock
Texas Bar No. 24106048
khancock@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
(817) 877-2807 – Fax

## CERTIFICATE OF SERVICE

I certify that on April 5, 2023, a true and correct copy of the foregoing document was served upon all counsel of record in this action via the Court's CM/ECF system.

/s/ Philip Vickers
Philip Vickers

26