IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education,<br><br>    Defendants. | Case No.:  4:23-cv-00206-P |

**APPENDIX IN SUPPORT OF PLAINTIFF'S
BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER**

| Description | Bates Number |
|---|---|
| Declaration of Nikki England (as filed in Support of Motion for Preliminary Injunction) | App. 1 |
| Declaration of Scott Shaw (as filed in Support of Motion for Preliminary Injunction) | App. 9 |

Dated: April 7, 2023

Respectfully submitted,

/s Allyson B. Baker
Allyson B. Baker (*pro hac vice*)
Meredith L. Boylan (*pro hac vice*)
Stephen B. Kinnaird (*pro hac vice*)
Michael Murray (*pro hac vice*)
Sameer P. Sheikh (*pro hac vice*)
Tor Tarantola (*pro hac vice* forthcoming)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20037
allysonbaker@paulhastings.com
(202)-551-1830

/s Philip Vickers
Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Katherine Hancock
Texas Bar No. 24106048
khancock@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800

*Attorneys for Plaintiff
Career Colleges & Schools of Texas*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CAREER COLLEGES
& SCHOOLS OF TEXAS,

   Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

   Defendants.

CASE NO.: 4:23-cv-206-P

**DECLARATION OF
NIKKI ENGLAND**

I, Nikki England, do hereby declare and state as follows:

## BACKGROUND

1. I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2. I am a product of career education and proud graduate of a proprietary school.

3. I serve as Chair of CCST's Board of Directors, and have served in this capacity since October 26, 2022. Prior to that, I served as a member of the Board of Directors for more than four years.

4. As Chair, I am responsible for, among other things, convening and overseeing meetings of the board of directors for CCST, engaging with CCST members on issues facing the

career education industry and proprietary sector, and engaging with skilled trade employers who have provided, and will provide, employment opportunities to career education graduates in Texas.

5.  In addition to serving as Chair of the CCST Board of Directors, I have extensive experience in the career education industry, having spent the last 16 years working on issues that impact career education, proprietary schools, and the American educational system, generally.

6.  CCST's headquarters is in Austin, Texas, but its members—of which there are more than 70 postsecondary schools, institutes, colleges, and universities—are located in Fort Worth, Grand Prairie, Arlington, elsewhere in the Northern District of Texas, and across the State of Texas.

7.  Career education schools are essential to preparing individuals to enter the skilled trade workforce, in Texas and around the country. Graduates of career education schools continue on to serve their communities and our country as nurses and medical assistants, plumbers and HVAC repair technicians, mechanics and truck repair specialists, and information technology and cybersecurity experts, among other skilled trade professions. Today, the need for skilled trade workers in our country has never been greater.

8.  CCST's mission is to represent and protect the interests of its career education school members, the students they train, as well as of career education, more generally, in the State of Texas.

## THE FINAL RULE

9.  In my capacity as Chairwoman of CCST, I am familiar with the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"),

the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

10. I am both personally familiar as well as knowledgeable based on my discussions with CCST member schools about the significant harm that the Final Rule continues to have and will have on career education schools both before and after the rule takes effect on July 1, 2023.

11. I understand that the Final Rule applies to Direct Loan program participants, and greatly broadens the substantive grounds for relief to student loan borrowers. For instance, I know that the Final Rule amends regulations, and establishes a new standard and process for adjudicating borrower defenses to repayment claims.

12. The new borrower defense regulations hold schools strictly liable for even minute and inadvertent misstatements and omissions, and have established processes that all but ensure borrower defense claims will be approved – regardless of whether the borrower can demonstrate harm. Lax standards for approval and the promise of debt cancellation will undoubtedly open the floodgates to such claims. Further, once the borrower defense claims are approved, the Department will have the ability to seek recoupment of monies from the schools, or otherwise force the taxpayer to bear the burden.

13. Further, under the Final Rule, group consideration of borrower defense claims are permitted, the possibility of anything less than a 100% loan discharge is removed, there is no statute of limitations for borrowers, and schools cannot seek reconsideration of or appeal an adverse decision by the Department in a borrower defense claim proceeding.

14. Additionally, the Final Rule prohibits the inclusion of mandatory arbitration provisions and class action waivers in contracts between institutions and students.

15. Most CCST member schools currently have mandatory arbitration provisions and class action waivers in contracts between the school and its students.

16. The implications of the Final Rule on CCST and its member schools are extensive, and both CCST and its member schools have already expended and continue to expend significant resources in anticipation of the Final Rule's effective date.

17. If enacted, the Final Rule would continue to drain the resources of CCST and its member schools; would result in reputational harm; and is extremely likely to result in excessive liability and even closure of member schools, irreparably harming schools and frustrating CCST's mission to support and grow career education schools in Texas.

18. Reputational harm to schools will, by extension, harm students and graduates, especially those seeking employment. Regulations that disproportionately punish career education and vocational schools will taint the entire career education industry, discourage future applicants, and, ultimately, harm communities and industries that critically rely on skilled trade workers.

## HARM TO CCST MEMBER SCHOOLS AND THEIR STUDENTS

19. The majority or 54 of CCST's member schools participate in the Direct Loan program, including participating schools in Tarrant County, and throughout the State of Texas.

20. As such, these schools are subject to and directly impacted by the Final Rule's provisions, including the BDR regulations.

21. Each of these member schools will be required to conform to the substantive provisions of the Final Rule specifying acts or omissions that give rise to borrower defenses. This will require schools to expend money and resources on measures necessary to confirm with the requirements imposed under the Final Rule. For example, the removal of any time limitation on when a borrower defense claim, and the burden placed on schools to disprove claims, necessarily

means that schools are now required to maintain extensive and long-term recordkeeping practices for past, current, and future students in anticipation of potential claims. Correspondingly, schools will bear the burden associated with and compliance efforts in order to avoid reputational and financial liability.

22. Additionally, each member school is subject to significantly increased liability due to the Final Rule's relaxation of BDR standards and elimination of the possibility of less than complete loan forgiveness.

23. Violations of the Final Rule's provisions would subject member schools to potential liability for discharged loans, revocation or denial of eligibility to participate in the federal student loan programs, or restrictions upon participation.

24. Further, the closed school discharge provisions of the Final Rule have had the effect of forcing institutions to abandon plans of opening new schools, building larger campuses to expand programmatic offerings and provide improved facilities, or relocating campuses to this District to meet increased demand for career education. The closed school discharge provisions will limit educational opportunities for future students and result in reduced quality of education for existing students.

25. Above all, regulations like those in the Final Rule that disproportionately harm career education schools, ultimately punish students, communities, and state and local economies. A decline in career education schools and vocational training will mean fewer welders, surgical technicians, truck drivers and repair personnel, and other skilled trade professionals that are the backbone of our country's infrastructure, security, and technology industries.

26. The Final Rule is already harming schools and students and the threat of substantial harm come July 1, 2023 is undoubtedly great.

## HARM TO CCST

27. A significant amount of CCST's resources have already been and continue to be diverted in order to identify and counteract the harms of the Final Rule. Indeed, CCST has already expended approximately three hundred staff hours working on issues integral to the Final Rule, including compliance measures that need to be undertaken in anticipation of the effective date.

28. Critically, CCST has lost out on potential additional members, and existing members have abandoned plans to build new schools, campuses, and facilities, on account of the new closed school discharge provisions in the Final Rule. The lost potential members has directly resulted in lost revenues to CCST, which relies on member dues that are calculated based on, among other things, the size of the schools' presence in Texas.

29. CCST, along with over a dozen other organizations representing career and private schools around the country, submitted 137 pages of comments before publication of the Final Rule in response to the Department's July 13, 2022 Notice of Proposed Rulemaking ("NPRM"). In its comments, CCST highlighted that the implementation of the Final Rule would threaten disproportionate financial and reputational harm to schools and would result in burdensome operational challenges.

30. CCST has additionally been working with its members and affiliate organizations to prepare for the future regulatory landscape, both before and after the publication of the Final Rule. This has included working with schools to manage heightened cost and resource demands related to a borrower defense process that permits borrowers to bring claims several years later.

31. CCST's resources will continue to be diverted should the Final Rule go into effect on July 1, 2023. In order to comply with the sweeping changes in the Final Rule, CCST will incur increased regulatory burdens and compliance costs. The effect of that is anticipated reduced

revenues and resources needed to support existing and future members. This will frustrate CCST's mission by diverting essential resources towards compliance with new regulations.

32. Additionally, CCST would experience drastically increased costs in order to support its members. Such costs include, but are not limited to, engagement of third-party training provider organizations to assist schools in conforming to expensive and burdensome compliance requirements under the Final Rule.

33. Liability against proprietary schools also substantially threatens the financial survival of CCST's member schools, which threatens CCST's operations and undermines its mission.

34. Moreover, the closed school discharge provision of the Final Rule has had the effect of forcing institutions to abandon plans of opening new schools, building larger campuses, or relocating campuses to this District, on account of the closed school discharge provision's overly broad criteria for what constitutes a "closed school" for purposes of granting complete loan discharges. This too has had the effect of eroding the growth of CCST's membership and will inevitably lead to a decrease in the membership of Texas schools.

35. A reduction in the number of CCST members would correspondingly result in reduced membership dues and other fees, on which CCST relies entirely to cover operations costs.

36. Putting aside the loss of future or potential members, the substantial threat of school closures and a drastic reduction in the number of CCST members, with particular effect on schools outside large populous cities, correspondingly threatens the survival of CCST itself.

37. Finally, as a prominent representative of the interests of Texas career education schools, CCST would incur irreparable reputational harm by the Final Rule, which disproportionately threatens career education schools and the proprietary sector.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of April, 2023. .

_____
NIKKI ENGLAND

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>               Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>               Defendants. | CASE NO.: 4:23-cv-206-P<br><br>**DECLARATION OF<br>SCOTT SHAW** |

I, Scott Shaw, do hereby declare and state as follows:

### **BACKGROUND**

1.    I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.    I am the President and Chief Executive Officer of Lincoln Educational Services Corporation ("Lincoln Tech"), which is headquartered in Parsippany, New Jersey. I have held this position since July 2015. I originally joined Lincoln Tech in 2001 as the Chief Financial Officer.

3.    As President and Chief Executive Officer, I am responsible for, among other things, overseeing our schools' operational activities. In addition, I am familiar with the extensive efforts undertaken by Lincoln Tech to ensure compliance with applicable regulations.

1

4. Founded in 1946, Lincoln Tech is now one of the country's largest providers of career education and training, operating 22 campuses in 14 states under four brands: Lincoln College of Technology, Lincoln Technical Institute, Lincoln Culinary Institute, and Euphoria Institute of Beauty Arts and Sciences. Our schools offer programs in health sciences, automotive technology, skilled trades, hospitality services, and business and information technology. Since our Lincoln Tech's founding in 1946, our schools have graduated more than 250,000 students.

5. Lincoln Tech has long supported carefully crafted rules, regulations, and legislation that protect both students and borrowers alike. However, the newly issued borrower defense regulations stack the decks against schools. They threaten substantial harm to not only Lincoln Tech schools but career education institutions across the country.

## LINCOLN TECH GRAND PRAIRIE

6. One of Lincoln Tech's premier schools is the Lincoln Technical Institute in Grand Prairie, Texas ("Lincoln Tech Grand Prairie"). Lincoln Tech Grand Prairie was formed in 1966 as an automotive technical school. The school's program offerings have expanded over the decades and currently include automotive technology, collision repair and refinishing, diesel technology, HVAC service and repair, machining and manufacturing, and welding technology.

7. Lincoln Tech Grand Prairie is a member of trade association Career Colleges and Schools of Texas (CCST).

8. Lincoln Tech Grand Prairie participates in the Direct Loan Program and is thus subject to the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule").

9. Lincoln Tech Grande Prairie has two campuses. The main campus is located at 2915 Alouette Drive in Grand Prairie. The second campus is located at 2501 Arkansas Lane in Grand Prairie.

10. Both campuses of Lincoln Tech Grand Prairie are located in Tarrant County, which I understand to fall within the Fort Worth Division of the Northern District of Texas.

11. During the 2022 academic year, Lincoln Tech Grand Prairie served proximately 900 students, the vast majority of whom took out Direct Loans to finance their education and meet their obligations.

12. Over the last 15 years, Lincoln Tech Grand Prairie has enrolled 14,854 students, approximately 31% of whom reside in one of the counties that fall within the Fort Worth Division; and approximately 41% of whom reside within the Northern District of Texas.

13. According to the Department's Rule, any of these students and alumni who have loan balances would be eligible to file a borrower defense claim based on the Rule's new standard, which lowers the threshold for claim approval and presume liability against schools, regardless of whether the borrower has any proof of harm.

## THE DEPARTMENT'S RULE AND
## HARMS SUFFERED PRIOR TO EFFECTIVE DATE

14. I have reviewed the Rule. I am familiar with its provisions and how they have harmed and are likely to harm Lincoln Tech schools and their staff, students, alumni, and communities both before and after the Rule takes effect.

15. Lincoln Tech Grand Prairie participates in the Department of Education's Direct Loan Program and will be subject to the Rule's requirements when they go into effect.

16. As President and Chief Executive Officer, I am additionally responsible for overseeing Lincoln Tech's strategic planning, including decisions about how to adjust the

allocation of the Lincoln Tech's resources in response to changes in student demand. These decisions include whether to open campuses in new markets, whether to close or consolidate facilities, and whether to expand or limit certain program offerings.

17. The Rule's closed school discharge provisions will have a significant and adverse impact on Lincoln Tech's future decisions regarding growth and expansion. If the Rule should become effective, Lincoln Tech will be forced to reconsider the opening of new campuses and upgrading of existing ones, whether in Texas, or other parts of the country. This is because of the potential liability resulting from "closing a school" – as that term is broadly defined in the new regulations. Under the new Rule, the consolidation of facilities, closing of one campus to open a newer and better one, or the reallocation of funding from one program to invest in others that have greater demand from students, could each constitute a "closed school" under the Rule, which gives the Department wide discretion to determine. In such a case, Lincoln Tech would be held liable for all outstanding loan balances for current and recent students of the "closed school" – even though there was no adverse impact (and more likely a positive impact) on the students' education.

18. The Rule's closed school provisions create a significant disincentive for schools to explore new program offerings, build new or upgrade existing campuses, or otherwise improve the facilities and services for students.

19. I am also responsible for, among other things, overseeing Lincoln Tech's financial performance, including its staffing and compliance costs.

20. As a result of the Rule, Lincoln Tech Grand Prairie and other schools are effectively being forced to expend time and resources that could otherwise be spent on educational programming to instead prepare to comply with new regulations. Such preparatory activities include, but are not limited to: counseling Lincoln Tech's schools and staff on the Rule's

requirements; reviewing every marketing and advertising material and training recruitment and admissions staff on account of the regulations' imposition of strict liability against schools; dedicating or allocating staff and resources to handle the anticipated flood of meritless borrower defense claims that will be submitted following the effective date and as a result of the lowered threshold for claim approval; and developing and upgrading recordkeeping systems to maintain student records for perpetuity, on account of the fact that there is no statutory of limitations to borrower defense claims.

21. I expect that compliance-related costs and burdens to Lincoln Tech schools will increase substantially if the Rule is allowed to go into effect.

## SUBSTANTIAL THREAT OF IMPENDING HARM THAT CANNOT BE UNDONE

22. I understand that under the Rule's new borrower defense standard, even inadvertent misstatements or omissions by school representatives or contractors could result in an approved borrower defense claim and the school's being liable for the complete loan discharge.

23. By eliminating the requirement of proof of harm and permitting claims based on unintentional and innocent erroneous statements or omissions to be the basis for an approved borrower defense claim, the Rule has the effect of holding schools like Lincoln Tech Grand Prairie strictly liable for meritless claims based on harmless conduct.

24. Further, under the Rule's new group claim process, there is the significant risk of tag-a-long claims. As a result, schools like Lincoln Tech could be liable for loan discharge amounts for entire groups of borrowers, regardless of whether each student was actually ever harmed by the school's alleged conduct.

25. Group claims and the resulting financial harm to schools would be so great as to threaten their closure, or at the very least divert resources away from educational offerings, thus

denying current and future generations of career education students the opportunity to better themselves and their communities.

26. Even if Lincoln Tech Grand Prairie were not forced to close as a result of liability, the reputational harm to the school of a borrower discharge would be substantial. Such a discharge by the Department may create a false impression that the school provides poor service, which would hurt the school's ability to recruit new students.

27. Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly conclude on the basis of the approval of a borrower defense claim and granting of a loan discharge that the students and graduates have received a subpar education – when the opposite is true.

28. Given the significantly lower burden that a borrower would need to meet for a claim to be approved, and the promise of a financial windfall as a result of a complete loan discharge, there are likely to be many students of Lincoln Tech Grand Prairie and other Lincoln Tech schools that will apply for such a discharge, especially when the Rule does not require borrowers to prove that they were ever harmed by the conduct the allege occurred.

29. Defending against the inevitable deluge of borrower defense claims will be costly and, given the new standard that presumes liability without due process protections for schools, effectively futile.

30. If the Rule is permitted to take effect on July 1, schools like Lincoln Tech Grand Prairie will suffer harm that cannot be undone.

App. 15

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of April, 2023.

_____
SCOTT SHAW